DEPARTMENT OF REVENUE, Petitioner-Appellant and Cross-Respondent, v. EXXON CORPORATION, Respondent and Cross-Appellant.

Supreme Court

*No. 76–751. Argued March 26, 1979.—Decided June 29, 1979.*
(Also reported in 281 N.W.2d 94.)

702

For the appellant there were briefs by *Bronson C. La Follette,* attorney general, and *John E. Armstrong,* assistant attorney general, and oral argument by *Allan P. Hubbard,* assistant attorney general.

For the respondent there were briefs by *Boardman, Suhr, Curry & Field,* attorneys, *Thomas G. Ragatz* and *James F. Lorimer,* of counsel, all of Madison, *McBride, Baker, Wieneke & Schlosser,* attorneys, *Lloyd M. McBride* and *Paul D. Frenz,* of counsel, all Chicago, Illinois, and *Joe O. Luby, Jr.,* of counsel, Exxon Corporation, Houston, Texas, and oral argument by *Thomas G. Ragatz* of Foley & Lardner, Madison.

DAY, J. This is an appeal and a cross-appeal in a corporate income and franchise tax case. The judgment from which this appeal is taken was entered in the circuit court for Dane County, January 31, 1977, the Honorable George R. Currie, presiding. The judgment was the result of a proceeding brought by the Department of Revenue (hereinafter Department) under ch. 227, Stats., to review a decision and order of the Wisconsin Tax Appeals Commission (hereinafter Commission) dated April 6, 1976. The Commission had modified the action of the Department denying Exxon's application for abatement of assessment of additional income and franchise taxes for the years 1965 through 1968. During the years in question, the taxpayer was the Humble Oil Refining Company, a wholly owned subsidiary of Standard Oil Company of New Jersey. In 1973, the parent company changed its name to Exxon Corporation, and Humble was merged into Exxon.

The following questions are presented by this appeal:

1. Were the taxpayer's Wisconsin operations an integral part of a unitary business within the meaning of sec. 71.07 (2), Stats. (1967) ?

2. Does the exclusion from taxation of situs income under the provisions of secs. 71.07 (1) and (2), Stats. (1967) apply to all income derived from the production of crude oil and natural gas, or only to that income derived from sales to third parties at or near the well-head?

3. In applying the statutory apportionment formula of sec. 71.07 (2), Stats. (1967), did the Department properly weight the cost of manufacturing factor by employing a divisor of 2.6, instead of 3?

We hold that the taxpayer's Wisconsin operations constituted an integral part of a unitary business, subject to statutory apportionment of its income. We also uphold the Department's interpretation of the situs income exclusion to apply only to income derived from sales to third parties at or near the well-head. Finally, for reasons discussed below, we remand the question of the weighting of the apportionment formula to the Commission for further proceedings.

The taxpayer is a corporation organized under the laws of Delaware, with its general offices located in Houston, Texas. This case deals only with the years 1965 through 1968. During that time, Humble Oil and Refining Company was a wholly owned subsidiary of Standard Oil Company of New Jersey. In 1956, Standard Oil of New Jersey organized a wholly owned Delaware subsidiary which then acquired all of the assets and liabilities of Saxon Corporation, a Wisconsin corporation formerly named Pate Oil Company. The new subsidiary continued the operations of the former Wisconsin company, under the name of Pate Oil Company, which consisted of marketing petroleum products and accessories in Wisconsin. Corporate income tax reporting to the State of

Wisconsin was done on the basis of separate accounting which reflected only the Wisconsin marketing operations. In 1960, Standard Oil of New Jersey caused the new Pate Oil Company to be merged into Humble Oil and Refining Company, and Humble continued the Wisconsin marketing operations under the brand name of Enco. In 1973, Humble was merged into Standard Oil of New Jersey, and the parent company's name was changed to Exxon. Exxon is the legal successor to Humble.

Humble timely filed its Wisconsin corporation income and franchise tax returns for the calendar tax years 1965 through 1968, using the separate accounting method. The returns showed losses in the amounts of $821,320; $1,159,830; $1,026,224; and $919,575, respectively for the years 1965, 1966, 1967 and 1968. No tax was shown as being due for those years.

The Department audited Humble for the tax years 1965 through 1968, and on June 25, 1971, the Department forwarded to Humble notice of assessment of additional income and franchise tax. The notice was appended to the Department's audit report, in which the auditor stated that Humble's income was subject to apportionment, thus subjecting it to tax on additional income of $4,532.155 for the period 1965 through 1968. Additional taxes in the amount of $316,470.85 were assessed against Humble.

Humble filed an application for abatement of the assessment, which was denied by the Department. Proceedings were held before the Wisconsin Tax Appeals Commission, which modified the Department's action of Humble's application for abatement by a decision and order dated April 8, 1976. The Commission found that Humble's three main functional operating departments—exploration and production, marketing, and refining—were each unitary businesses. The Commission decided that the Department had properly refused to permit

Humble to report its income by the separate accounting method, that for the years in dispute, Humble was operating a multi-state unitary marketing business within the meaning of sec. 71.07 (2), Stats., and that Humble's Wisconsin marketing operation was an integral part of that marketing business. However, the Commission also found that Humble's Wisconsin marketing operations were not an integral part of either Humble's exploration and production function or refining function, and that there was no economic dependence between Humble's Wisconsin marketing operations and the exploration and production and refining functions. Thus, the Commission concluded that the Department could not use the statutory apportionment formula to reach income from Humble's refining and exploration and production departments.

On review under ch. 227, the Circuit Court for Dane County set aside some of the findings of the Commission. Judge Currie, in his opinion, stated that the following findings of fact were actually erroneous conclusions of law and set them aside:

"19. The petitioner's three main functional operating departments, exploration and production, marketing, and refining, were each unitary businesses.

"21. During the period involved herein, there was no economic dependence between the petitioner's Wisconsin marketing operations and its exploration and production function.

"23. During the period involved herein, there was no economic dependence between the petitioner's Wisconsin marketing operations and its refining function."

The trial court also set aside the following conclusions of law made by the Commission:

"3. During the years in issue, the petitioner was operating a multi-state unitary marketing business within the intent and meaning of Section 71.07 (2) of the Wis-

consin Statutes, and the petitioner's Wisconsin marketing operation was an integral part thereof.

"6. The apportionment formula used by the respondent in the audit and assessment here under review was improper in including income from petitioner's exploration, production and refining departments, and resulted in assessing a tax on extraterritorial income earned by the petitioner.

"7. An apportionment formula, apportioning income earned by the petitioner from its marketing function within and without the State of Wisconsin, would be proper and within the intent and meaning of the statutory mandate contained in Section 71.07(2) of the Wisconsin Statutes."

However, the trial court also held that the Department's interpretation of the situs exclusions of sec. 71.07 (1) and (2) to exclude from taxation only Humble's income from crude oil and gas sold to third persons at the situs of origin, thus subjecting the remainder of situs income to taxation through application of the apportionment formula would be unfair and violative of the intent of sec. 71.07. The trial court also approved the Department's weighting of the costs of manufacturing aspect of the apportionment formula to provide for a divisor of 2.6, instead of 3, as prescribed in the statute.

The Department appeals only from that portion of the judgment which determined that the Department must exclude all situs income derived from the production of crude oil and gas, whether or not sold to third parties. Exxon appeals from those aspects of the judgment which determined that Humble's total business within and without Wisconsin constituted a unitary business, and which permitted the Department to weight the costs of manufacturing component of the apportionment formula.

QUESTION #1: WERE THE TAXPAYER'S WISCONSIN OPERATIONS AN INTEGRAL PART OF A UNITARY BUSINESS WITHIN THE MEANING OF SEC. 71.07(2), STATS. (1967)?

This case brings into play several sections of ch. 71, Stats. (1967):

"71.01. **Imposition of tax; exempt income.** . . . (2) FRANCHISE TAX ON CORPORATIONS. For the privilege of exercising its franchise or doing business in this state in a corporate capacity every domestic or foreign corporation, except corporations specified in sub. (3), shall annually pay a franchise tax according to or measured by its entire net income of the preceding income year at the rates set forth in s. 71.09 (2am). Every corporation organized under the laws of this state shall be deemed to be residing within this state for the purposes of this franchise tax. All provisions of chs. 71 and 73 relating to net income taxation of corporations shall apply to franchise taxes imposed under this subsection, unless the context requires otherwise. The tax imposed by this subjection on national banking associations shall be in lieu of all taxes imposed by this state on national banking associations to the extent it is not permissible to tax such associations under federal law."

"71.07. **Situs of income; allocation and apportionment.** (1) For the purposes of taxation income or loss from business, not requiring apportionment under sub. (2), (3) or (5), shall follow the situs of the business from which derived. Income or loss derived from rentals and royalties from real estate or tangible personal property, or from the operation of any farm, mine or quarry, or from the sale of real property or tangible personal property shall follow the situs of the property from which derived. Corporation income from personal services performed by employes of corporations shall be deemed business income and shall follow the situs of the business. Income from personal services and from professions of resident individuals shall follow residence. Income from personal services of nonresident individuals, including income from professions, shall follow the situs of the services. All other income or loss, including royalties from patents; income or loss derived from land contracts, mortgages, stocks, bonds and securities or from the sale of similar intangible personal property, shall follow the residence of the recipient, except as provided in s. 71.07 (7). For the purposes of taxation, interest received on

state and federal tax refunds when the tax refunded was on business income or property shall be deemed income from business and shall follow the situs of the business from which derived.

"(2) Persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state. The amount of such income attributable to Wisconsin may be determined by an allocation and separate accounting thereof, when the business of such person within the state is not an integral part of a unitary business, provided, however, that the department of taxation may permit an allocation and separate accounting in any case in which it is satisfied that the use of such method will properly reflect the income taxable by this state. In all cases in which allocation and separate accounting is not permissible, the determination shall be made in the following manner: There shall first be deducted from the total net income of the taxpayer such party thereof (less related expenses, if any) as follows the situs of the property or the residence of the recipient; provided, that in the case of income which follows the residence of the recipient, the amount of interest and dividends deductible under this provision shall be limited to the total interest and dividends received which are in excess of the total interest (or related expenses, if any) paid and allowable as a deduction under section 71.04 during the income year. The remaining net income shall be apportioned to Wisconsin on the basis of the ratio obtained by taking the arithmetical average of the following 3 ratios: . . ."

The purpose of these sections is to determine what portion of a taxpayer's income is attributable to activities in the state of Wisconsin, since the opening sentence of sec. 71.07 (2) states: "Persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state."

The two methods—separate accounting and formula apportionment—were described in Keesling and Warren, *The Unitary Concept*, 12 Hastings Law Journal 42, 43 (1960) as follows:

"In the apportionment of business income two methods have been devised which have come to be known as the 'separate accounting' method and the 'formula' method, respectively. Under the separate accounting method, as the name implies, the business within the state is treated separately and distinctly from the business outside the state and the income is computed in much the same manner as it would be if the taxpayers' activities were confined solely to the taxing state. The gross income from the business activities within the state is first determined. The allowable deductions are then subtracted. The remaining net income is attributed in its entirety to the taxing state.

"Under the formula method the business activities within the state are considered to be an inseparable part of a business carried on both within and without the state. The total gross income from the entire business is determined. The allowable deductions are then subtracted and the remaining net income is apportioned within and without the state by means of an allocation formula consisting of various factors which are thought to be relevant in the production of income, such as property, payroll, and sales."

The term "unitary" has been variously defined. The definition applied in *Interstate Finance Corp. v. Dept. of Taxation,* 28 Wis.2d 262, 269, 137 N.W.2d 38 (1965), and relied on by the trial court in the instant case, borrows from the text authority Altman & Keesling, *Allocation Of Income In State Taxation,* (2d ed.), p. 101:

". . . the essential test is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such a relationship the business is unitary."

This is the definition to which we continue to adhere.

Sec. 71.07 (2), Stats. (1967) requires that the apportionment method be used by a taxpayer engaged in business within and without the state when the taxpayer's

Wisconsin business is an integral part of a unitary business. *Celon Co. v. Dept. of Taxation,* 269 Wis. 372, 377–78, 69 N.W.2d 453 (1955). The statute sets forth ratios for the apportionment method but gives the department considerable latitude in adopting a formula which will most accurately reflect a reasonable and equitable tax on the income earned in Wisconsin. *Interstate Finance Corp., supra* at 271–272. This court has held that the latitude of the statute itself is not unconstitutional as arbitrary or unreasonable or taxing extraterritorial income, although the application of the statute in some instances might be. *Id.* at 272.

The trial court below characterized some of the findings of the Tax Appeals Commission as erroneous conclusions of law, rather than findings of fact. Those findings were: 1) that Humble's three main functional operating departments—exploration and production, marketing, and refining—were each unitary businesses; 2) that there was no economic dependence between Humble's Wisconsin marketing operations and the exploration and production function, and 3) that there was no economic dependence between Humble's marketing operations and the refining function.

Judge Currie, when a Wisconsin Supreme Court Justice wrote the opinion of this Court in *Pabst v. Dept. of Taxation,* 19 Wis.2d 313, 120 N.W.2d 77 (1963), wherein this Court pointed out that courts use two conflicting methods of administrative review where the issue is whether the administrative agency has correctly applied a statute to certain facts.

"The first is the so-called analytical approach whereby the court decides which part of the agency's determination presents a question of fact and which part a question of law. The second is the practical or policy approach which tries to avoid allocation of functions merely on the literal meaning of the terms 'fact' and 'law.' When this practical approach is used, the court holds that,

'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' On the other hand, Davis notes that when the court deems the question presented to be suitable for judicial determination, it feels free to substitute its own judgment for that of the agency. When the court substitutes its own judgment, however, it would appear that it in effect finds the agency's decision without rational basis in law or treats the issue analytically as a question of law for the court." *Id.* at 322–23.

While this court has held that ch. 227, Stats. requires that courts employ the "analytical" approach when reviewing agency decisions, this court will give deference to agency determinations, where the agency has particular expertise, rational basis exists in law for the agency's interpretation, and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions. *Id.* at 323–24.

When mixed questions of law and fact are presented to this court, there are really two component questions which must be answered. The first question is what, in fact, actually happened; the second question is whether those facts, as a matter of law, have meaning as a particular legal concept. Comment, *The Scope of Judicial Review of Administrative Agency Decisions in Wisconsin,* 1973 Wis. L. Rev. 554 (1973). The question of whether the facts fulfill a particular legal standard is itself a question of law. See *Cheese v. Industrial Comm.,* 21 Wis.2d 8, 15, 123 N.W.2d 553 (1963).

Thus, for example, in *Cheese, supra,* the court substituted its judgment for that of the Industrial Commission on whether particular conduct by the claimant constituted "misconduct connected with his employment." In *Pabst, supra,* the court concluded that the question of whether a trust was administered in Wisconsin was a question of

law. In *Globe-Union, Inc. v. Dept. of Taxation,* 20 Wis. 2d 213, 219, 121 N.W.2d 894 (1963), the court treated as a question of law, whether various sales had been made in Wisconsin for purposes of corporate income tax apportionment.

This court accepts the view of the circuit court in this case that the question of whether Humble constituted a unitary operation is a question of law. The manner in which Humble conducted its business requires a series of factual determinations; the legal significance of those business arrangements is a judicial question subject to review by this court. Further, in its findings, the Tax Appeals Commission only stated that there was no economic dependence between the Wisconsin marketing operations and the refining and exploration and production functions of Humble. The full test requires a determination of whether the operation of the portion of the business is "dependent upon *or contributory to* the operation of the business outside the state." *Interstate Finance Corp., supra,* 28 Wis.2d at 269. (Emphasis added.)

For the years in question, Humble's corporate organization consisted of three parts: corporate management, coordination and services management, and operations management. Corporation management was the highest level of management in the company. In this review, the court is concerned only with operations management which was responsible for directing the operating activities of the individual functional segments of the company. Each functional segment was organized into a separate department which operated independently of the other operating segments. The individual functional segments under Operations Management consisted of Exploration and Production, Refining, Marketing, Marine, Coal and Shale Oil, Minerals, Land Management. Exploration and Production was further broken down

into exploration, production, and natural gas. The three major departments were Exploration and Production, Refining, and Marketing.

Each operating department had its own separate management responsible for the proper conduct of the operation. Each had a separate profit center which provided a means for recording transactions involving expense and revenue so that a profit for each function could be determined. Each department was considered a separate investment center by the company.

It was the management philosophy of Humble to have each department independently responsible for its performance in order to measure the performance of each department. Under this system, each department is in competition with the other departments for available funds for investment. Each functional department was also in competition with other members of the industry operating the same function.

There was no requirement that crude oil produced by the Production department flow through the marketing outlets in the form of Humble refined products. The company had extensive dealings with third parties for the acquisition of raw materials and products sold.

It was company policy that the transfer of products and raw materials between departments be based on competitive wholesale market prices. Thus, crude oil produced and transferred to the refining department was accounted for at posted industry prices. As a result the refining department paid the same price for Humble-produced crude as it would pay for crude oil from any other supplier. Products transferred from the refining department to the marketing department were also based on wholesale market prices or some alternate value. Where there was no readily available wholesale market value for a product, Oral Luper, an Exxon senior vice president testified that "the representatives of our Mar-

keting Department and our Refinery Department with both of their knowledge of the market, knowledge of the products, negotiate with each other on an arm's length basis in an adversary position to try to negotiate the appropriate transfer value to the best of their ability, market orientated."

Significantly, Luper also testified as to the reasons for organizing the separate operating departments under one corporate entity.

". . . [I]n any industry which is highly capital intensive, such as the petroleum industry, the fixed operating costs are highly relative to total operating costs, and for this reason the profitability of such an industry is very sensitive and directly related to the full utilization of the capacity of the facilities.

"So, in the case of the petroleum industry . . . where you have high capital investments in refineries, the existence of an assured supply of raw materials and crude is important and the assured and stable outlet for products is important, and therefore when there are— when these segments are under a single corporate entity, it provides for some assurance that the risk of disruptions in refining operations are minimized due to supply and demand imbalances that may occur from time to time."

Luper also stated that putting the individual operating segments under one corporate entity provided greater profit stability for the company, spread risks, and enabled corporate staff to provide services on a corporate-wide basis more efficiently and effectively. The existence of a stable and assured market outlet is directly related to the refining investment. Luper testified that as an officer of the company, he is concerned directly with the overall profits of the entire company. The profits of each of the individual functional segments go into a determination of the overall corporate profits.

Humble has a uniform credit card system used nation-wide which is a valuable marketing tool. It is admin-

istered centrally in Houston, Texas, with accounting and collection carried out at two or three credit card centers. Humble promotes its products by uniform packaging and brand names. The overall plan for distribution of products is developed in Houston. Promotional display equipment is designed by the engineering staff at headquarters marketing. Key employees of the company are transferred from one department to another frequently.

The factors determining whether Humble produced crude oil will be sold to third parties or transferred to the Humble refinery include the distance from the point of production to the refinery and the quality of the crude. Once Humble-produced crude enters the pipeline system, it moves to the most desirable market, and in some cases, that is to a Humble refinery. There is no way of identifying the origin of the crude oil after it has entered the pipeline.

It is undisputed that Humble carried on no production or refining functions in Wisconsin. The only activities in the state related to marketing of the product. The gasoline and fuel oil sold in Wisconsin by Humble did not originate in Humble's oil wells. They came into the state as a result of an exchange agreement Humble had with Pure Oil Company at Lemont, Illinois. The products exchange portion of the agreement was set up at a time when Humble was expanding in the Midwest market. Pure Oil had more refining capacity than marketing requirements in the Midwest and wanted to find a way to get products to the East coast. The major purpose of any exchange agreement of this type is to reduce the cost of transporting the product from the source of production to the point where it is sold. The exchange contracted was negotiated by Humble's Supply and Refining Departments.

The gasoline received by Humble in the exchange is either refined according to Humble's specifications or

meets certain basic criteria before it is accepted by Humble for exchange. For Humble-refined gasoline, additives developed by Humble are mixed into the gasoline at the refinery. For gasoline acquired through exchange, the Humble additives are injected into the gasoline at the point of exchange. Seasonal variations in weather must be taken into account so that a different gasoline is manufactured for winter than is manufactured for summer. Quality control starts at the time of refining and continues through transportation to insure that the quality of gasoline delivered at the service station is the same as that produced at the refinery.

Motor oils, greases, and other packaged products were produced and manufactured by Humble outside of Wisconsin and shipped into the state for sale from Humble's central warehouse facilities in Chicago, Illinois, and other out-of-state locations. Tires, batteries and accessories were centrally purchased by Humble's purchasing office in Houston, Texas and shipped from out-of-state locations into Wisconsin for sale.

What emerges from this pattern of organization is that Humble's production and refining functions depended upon the marketing operation to provide an outlet for its products. Wisconsin was a part of Humble's marketing system. In a high capital investment industry such as the petroleum industry, the existence of a stable and assured marketing system is important for the full utilization of refining capacity. This was the testimony of a top Exxon executive who admitted that the profits of the overall corporation depend on the profits of each of the individual functional segments.

The United States Supreme Court has held that the enterprise of a corporation which manufactures and sells its manufactured product is ordinarily a unitary business, and all the factors in that enterprise are essential to the realization of profits. *Butler Brothers v. Mc-*

*Colgan*, 315 U.S. 501, 508 (1942) ; *Hans Rees' Sons v. North Carolina*, 283 U.S. 123, 133 (1931).

The Oregon Tax Court, in a case dealing with the identical taxpayer, faced a factual pattern virtually indistinguishable from the one before this court. Humble's operations in Oregon were almost exclusively concerned with marketing. It had no manufacturing or refining facilities in Oregon, nor any sale of crude oil or natural gas. Although it was engaged in exploration for crude oil in Oregon during the years in question, there was no production. All of the refined petroleum products and related automotive accessories sold in Humble's service stations in Oregon were acquired by purchase from third party suppliers, except for oils and greases which were supplied centrally by Humble from its plants and refineries throughout the United States. These centrally supplied items amounted to about five percent in value of the total products marketed in Oregon. Humble's books, maintained on a separate accounting basis, showed a net operating loss for the Oregon operations.

The Oregon Tax Court determined that Humble was a unitary business and that the apportionment method of accounting was proper because it most fairly and accurately reflected the net income of the taxpayer attributable to Oregon. The court also made the following comments:

"Humble Oil & Refining Company is a large vertically integrated corporation engaged nationwide in all phases of the petroleum industry, from discovery through production and manufacture to marketing. It has unity of ownership, operations, management, control and products; and strong centralized credit, purchasing, advertising, accounting and legal services. All segments of plaintiff's business have a great deal in common and contribute to and are dependent upon each other. The plaintiff is actually a single interrelated unitary business operation. The component parts, including those in Oregon, are too closely connected and necessary to each other to be considered as independent units.

"Producing in one state and selling in another depends upon a multitude of interdependent operations, and although the petroleum Humble sold in Oregon was not its own production but that of a third party, the sales nevertheless were made possible by the company's own production. If plaintiff wasn't producing it wouldn't be selling, and what plaintiff did in Oregon was not due solely to conditions here, but was dependent upon the market elsewhere and upon plaintiff's production and manufacturing elsewhere. The marketing in Oregon was an integrated part of plaintiff's nationwide business and undoubtedly was beneficial to the corporation as a whole. It was not a completely separate, independent or local endeavor. Plaintiff's production and refining conform to the demands of the nationwide market, and the court believes plaintiff expanded into Oregon to increase demand for its products so that it could increase production and refining and thus increase profits and its stature in the industry.

"There certainly was more to plaintiff's decision to operate service stations in Oregon than the mere hope the stations might show a profit. The purpose of marketing here was to increase over-all marketing strength for the benefit of all phases of plaintiff's business. Costs incurred here led to profits elsewhere, and the primary measure of success of Oregon activities was not the profit or loss shown on the income statements of the local service stations, but rather it was the contribution the stations made to plaintiff's over-all operations and growth that really counted. The plaintiff bought its Oregon inventory of gasoline from third parties because it was more economical to do so, and whether an outlet sold Humble production or that of another company was a central management decision based on over-all economic considerations. Each activity of the company was carried on in whatever locality was most economically feasible. Plaintiff was so organized and vertically integrated that its separate parts, geographical and structural, could not be fairly considered by themselves." *Humble Oil & Refining Company v. Dept. of Revenue*, 4 OTR 284, 292–93 (1971).

That Humble reported losses for its Wisconsin operations for the disputed years is immaterial. The same

question was addressed in *Butler Brothers v. McColgan, supra.* In that case, Butler Brothers was a wholesale merchandising company whose home office was in Illinois, and which had branches in seven different states. It attempted to show that its California branch operated at a $70,000 loss as reflected in a separate accounting return, and that an income tax calculated on an apportionment basis was unconstitutional because it taxed extraterritorial values. The Supreme Court commented:

"It is true that appellant's separate accounting system for its San Francisco branch attributed no net income to California. But we need not impeach the integrity of that accounting system to say that it does not prove appellant's assertion that extraterritorial values are being taxed. Accounting practices for income statements may vary considerably according to the problem at hand. Sanders, Hatfield & Moore, A Statement of Accounting Principles (1938), p. 26. A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders. Cf. Hamilton, Cost as a Standard for Price, 4 Law & Contemporary Problems 321. That may be due to the fact, as stated by Mr. Justice Brandeis in *Underwood Typewriter Co. v. Chamberlain,* 254 U.S. 113, 121, that a State in attempting to place upon a business extending into several States 'its fair share of the burden of taxation' is 'faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders.' Furthermore, the particular system used may not reveal the facts basic to the State's determination. *Bass, Ratcliff & Gretton, Ltd. v. Tax Commission, supra,* p. 283. In either aspect of the matter, the results of the accounting system employed by appellant do not impeach the validity or propriety of the formula which California has applied here." 315 U.S. at 507–508.

■

We hold that the taxpayer's Wisconsin operations were an integral part of a unitary business within the meaning of sec. 71.07(2), Stats. (1967). Thus, its income was

subject to apportionment under the statutory formula. The constitutionality of this apportionment will be discussed below together with our consideration of the situs income exclusion.

QUESTION #2: DOES THE EXCLUSION FROM TAXATION OF SITUS INCOME UNDER THE PROVISIONS OF SEC. 71.07(1) AND (2), STATS. (1967), APPLY TO ALL INCOME DERIVED FROM THE PRODUCTION OF CRUDE OIL AND NATURAL GAS, OR ONLY TO THAT INCOME DERIVED FROM SALES TO THIRD PARTIES AT OR NEAR THE WELL-HEAD?

The pertinent portions of sec. 71.07 are:

"71.07. **Situs of income; allocation and apportionment.** (1) For the purposes of taxation income or loss from business, not requiring apportionment under sub. (2), (3) or (5), shall follow the situs of the business from which derived. Income or loss derived from rentals and royalties from real estate or tangible personal property, or from the operation of any farm, mine or quarry, or from the sale of real property or tangible personal property shall follow the situs of the property from which derived. . . .

"(2) Persons engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state. The amount of such income attributable to Wisconsin may be determined by an allocation and separate accounting thereof, when the business of such person within the state is not an integral part of a unitary business, provided, however, that the department of taxation may permit an allocation and separate accounting in any case in which it is satisfied that the use of such method will properly reflect the income taxable by this state. In all cases in which allocation and separate accounting is not permissible, the determination shall be made in the following manner: There shall first be deducted from the total net income of the taxpayer such part thereof (less related expenses, if any) as follows

the situs of the property or the residence of the recipient; . . ."

The parties agree that extraction and production of gas and oil is "mining" within the meaning of sec. 71.07 (1), Stats., *supra*. Gas and oil operations were held to be situs operations by the Tax Appeals Commission in *Leonard R. Jevne v. Dept. of Revenue,* Docket No. I–4956, April 14, 1976 CCH par. 12–402.577; *Deane A. Neitzel v. Wisconsin Dept. of Revenue,* Docket No. I–4872, November 17, 1975, CCH par. 12–402.577, and we concur in that view.

It is the position of the Department of Revenue that the situs income exclusion applies only to income realized from sales of crude oil and gas to third parties. The Department does not recognize as excludable situs income the value of crude oil and gas transferred by Humble from its production to refinery operations. There was testimony that such transfers took place at "posted field prices," which are considered to be bona fide third party prices.

Sec. 71.07, Stats. (1967) divides the income of a taxpayer operating both within and without Wisconsin into "apportionable income" and "nonapportionable income." Apportionable income is that income which for income tax purposes must be allocated to two or more states in which the taxpayer's business is carried on. Nonapportionable income is that income which follows the situs of the property or the residence of the taxpayer and, as a result, is not allocated among two or more states. *Transamerica Financial Corp. v. Dept. of Revenue,* 56 Wis.2d 57, 65–66, 201 N.W.2d 552 (1972).

However, the statute contains an ambiguity since sec. 71.07 (1), reads:

". . . For the purpose of taxation income or loss from business, *not requiring apportionment* under sub. (2), (3) or (5), shall follow the situs of the business from which derived. . . ." (Emphasis added.)

Since Exxon is unitary, apportionment of its business *is* required. This reading of the statute supports the department's interpretation that situs income which is part of the unitary stream of income is apportionable, while situs income which does not enter the unitary stream is nonapportionable, and therefore excludable. If situs income could not be apportioned, there would have been no reason to include the words "not requiring apportionment. . ." in the subsection dealing with situs income.

The holding of *Transamerica Financial Corp., supra,* which construed the meaning of the interest and dividends deduction of sec. 71.07 is inapposite. There, the court said an administrative construction by the department would not be given force where inconsistent with an unambiguous statutory provision. Here the statute is ambiguous, and subject to interpretation.

The question remains whether the state's effort to reach income from the taxpayer's refining and exploration and production departments comports with the constitutional requirements of the Due Process and Commerce Clauses.

If a state tax " 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State,' no impermissible burden on interstate commerce will be found, *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279 (1977) ; *Washington Revenue Dept.,* 435 U.S. at 750." *Japan Line, Ltd. v. County of*

*Los Angeles,* — U.S. —, 99 S. Ct. 1813, 60 L. Ed.2d 336 (1979).

Recently, the United States Supreme Court upheld the constitutionality of Iowa's single factor apportionment formula. *Moorman Mfg. Co. v. Bair,* 437 U.S. 267 (1978). In that case, Moorman Manufacturing was an Illinois corporation engaged in the manufacture and sale of animal feeds. The products sold to Iowa customers were manufactured in Illinois, but the company had over 500 salesmen in Iowa and owned six warehouses in the state from which deliveries were made to Iowa customers.

Moorman's Due Process argument rested on two premises—first, that its Illinois operations were responsible for some of the profits generated by sales in Iowa, and second, that a formula that reaches any income not in fact earned within the borders of the taxing state violates due process.

On the first argument, the Court said that Moorman had failed to make out a factual case:

"Appellant does not suggest that it has shown that a significant portion of the income attributed to Iowa in fact was generated by its Illinois operations; the record does not contain any separate accounting analysis showing what portion of appellant's profits was attributable to sales, to manufacturing, or to any other phase of the company's operations. But appellant contends that we should proceed on the assumption that at least some portion of the income from Iowa sales was generated by Illinois activities." 437 U.S. at 272.

Exxon maintains that this language entitles it to succeed since by separate functional accounting, it has shown the income for all three of its functional operations. In Exhibit twenty-eight, Humble set forth a comparison between the Wisconsin results yielded by separate accounting, and those yielded by apportionment of the marketing function alone, the marketing and refining functions, as well as alternative treatment of situs income

from the exploration and producton department.[1] Exxon argues that it has proven by functional accounting that extraterritorial income was included in the Wisconsin apportionment formula, since Humble's exploration and production income was all earned from activities outside of Wisconsin.

Initially, we point out that the implication in the language upon which Exxon relies is merely *dicta*. More importantly, the idea of separate functional accounting seems to be incompatible with the

"very essence of formulary apportionment, namely, that where there are integrated, interdependent steps in the economic process carried on by a business enterprise, there is no logical or viable method for accurately separating out the profit attributable to one step in the economic process from other steps. It is for that reason that the States have resorted to formulary apportionment—unrefined and approximate though the results may be—in the case of an enterprise engaged in manufacturing and selling, where the activities take place in more than one State. Essentially, the same inherent difficulties are present in seeking to divide the profits of an oil company, where producing, manufacturing and marketing take place in different States." Hellerstein, *State And Local Taxation,* (3rd Edition, 1969), p. 400.

Rather, the question is whether the state's grasp remains within the limits of constitutional mandates. This is borne out by the further comments of the court in *Moorman,* 437 U.S. at 272–274:

"Yet even were we to assume that the Illinois activities made some contribution to the profitability of the Iowa sales, appellant's claim that the Constitution invalidates an apportionment formula whenever it may result in taxation of some income that did not have its source in the taxing State is incorrect.

"The Due Process Clause places two restrictions on a State's power to tax income generated by the activities of an interstate business. First, no tax may be imposed, unless there is some minimal connection between those

¹ Abstracted from Exhibit 28:

HUMBLE OIL & REFINING COMPANY
1965 - 1968 Wisconsin Corporation Franchise Tax Audit
Summary of Alternative Methods of Attributing Income to Wisconsin

Schedule A — 1965-1968²
Page 1 of 1

| Year | State's Hybrid Apportionment | | Humble's Wisconsin Separate Accounting | | Marketing Function Apportioned Only | | Marketing & Refining Apportioned Only | | Exploration And Production Separate Business or Allocation to Situs | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Taxable Income | Tax | Taxable Income | Tax | Taxable Income | Tax | Taxable Income | Tax | Taxable Income | Tax |
| 1965 | $ 759,371 | $ 52,961 | ($ 821,320) | $ -0- | $ 541,794 | $ 37,731 | $ 282,383 | $ 19,572 | $ 310,841 | $ 21,564 |
| 1966 | 1,043,395 | 72,843 | (1,159,830) | -0- | 316,081 | 21,931 | 430,886 | 29,967 | 443,520 | 30,851 |
| 1967 | 1,264,946 | 88,351 | (1,026,224) | -0- | 394,993 | 27,455 | 490,252 | 34,123 | 503,182 | 35,028 |
| 1968 | 1,464,443 | 102,316 | (919,575) | -0- | 833,739 | 58,167 | 655,869 | 45,716 | 700,086 | 48,811 |
| Totals | $4,532,155 | $316,471 | ($3,926,949) | $ -0- | $2,086,607 | $145,284 | $1,859,390 | $129,378 | $1,957,629 | $136,254 |
| | (From Audit Report) | | (From Wisconsin Returns) | | (From Schedule D) | | (From Schedule E) | | (From Schedule C) | |

Differences With State Audit And:

a) Separate Accounting     $8,459,104    $316,471

b) Marketing Apportioned Only     $2,445,548    $171,187

c) Marketing And Refining Apportioned Only     $2,672,765    $187,093

d) Exploration And Production As Separate Business Or Allocation To Situs     $2,574,526    $180,217

NOTE: This schedule summarizes the resulting Wisconsin net taxable income and franchise tax liability under four alternative conclusions as to the method for arriving at the net income attributable to Humble's activities in Wisconsin during the years 1965 thru 1968.

   1) Separate accounting for Wisconsin marketing activities, as reported in Humble's Wisconsin tax returns.

   2) Marketing functional department's net income allocated and apportioned to Wisconsin under the statutory formula, and all other income treated as from separate out-of-state businesses.

   3) Marketing and Refining functional departments' combined net income allocated and apportioned to Wisconsin under the statutory formula; and all other income treated as from separate out-of-state businesses.

   4) Exploration and Production function's net income treated as (a) a separate out-of-state business, or (b) as income from "mining" allocated to situs, with all other non-allocable net income of Humble apportioned under the statutory three-factor formula.

activities and the taxing State. *National Bellas Hess, Inc. v. Dept. of Revenue,* 386 U.S. 753, 756, 87 S. Ct. 1389, 1390, 18 L. Ed.2d 505. This requirement was plainly satisfied here. Second, the income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing state.' *Norfolk & Western R. Co. v. Missouri,* 390 U.S. 317, 325, 88 S. Ct. 995, 1001, 19 L. Ed.2d 1201.

"Since 1934 Iowa has used the formula method of computing taxable income. This method, unlike separate accounting, does not purport to identify the precise geographical source of a corporation's profits; rather, it is employed as a rough approximation of a corporation's income that is reasonably related to the activities conducted within the taxing State. The single-factor formula used by Iowa, therefore, generally will not produce a figure that represents the actual profits earned within the State. But the same is true of the Illinois three-factor formula. Both will occasionally over-reflect or under-reflect income attributable to the taxing State. Yet despite this imprecision, the Court has refused to impose strict constitutional restraints on a State's selection of a particular formula. . . .

"In individual cases, it is true, the Court has found that the application of a single-factor formula to a particular taxpayer violated due process. See *Hans Rees' Sons v. North Carolina,* 283 U.S. 123, 51 S. Ct. 385, 75 L. Ed. 879; *Norfolk & Western R. Co. v. State Tax Comm.,* 390 U.S. 317, 88 S. Ct. 995, 19 L. Ed.2d 1201. In *Hans Rees',* for example, the Court concluded that proof that the formula produced a tax on 83% of the taxpayer's income when only 17% of that income actually had its source in the State would suffice to invalidate the assessment under the Due Process Clause. But in neither *Hans Rees'* nor *Norfolk & Western* did the Court depart from the basic principles that the States have wide latitude in the selection of apportionment formulas and that a formula-produced assessment will only be disturbed when the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportion to the business transacted . . . in that State,' 283 U.S., at 135, 51 S. Ct., at 389, or has 'led to a grossly distorted result,'

390 U.S. at 326, 88 S. Ct. at 1002." 98 S. Ct. at 2344–2345."

Exxon also argues that the Wisconsin apportionment formula violates the Commerce Clause since the sources of income derived from the exploration and production function were all in states other than Wisconsin.

However, the court in *Moorman* stated:

". . . Since there is no evidence in the record regarding the percentages of its total net income taxed in the other States in which it did business during those years, any claim that appellant was taxed on more than 100% of its total net income would also be speculative." 437 U.S. at 276, fn. 11.

Such evidence is also absent from the record in the instant case.

Using the figures from Exhibit thirty-five,[2] Wisconsin sales for the four years represented .41 percent of total company sales ($60,073,293 divided by $14,648,694,678). Wisconsin assessed taxable income for the four years represented .22 percent of total company net income adjusted to a Wisconsin basis ($4,532,155 divided by $2,022,206,871). Wisconsin can hardly be accused of reaching out for more than its fair share of the taxpayer's income.

■■■■

The taxpayer's activities have a "substantial nexus" with the state, as demonstrated by Wisconsin sales of $60,073,293 for the four year period of refined petroleum products and automotive accessories. As discussed above, the tax is fairly apportioned to represent only that part of the taxpayer's income which can be attributed to its Wisconsin activities. There has been no claim that the tax discriminates between interstate and intrastate commerce. Finally, the tax is "fairly related to services provided by the State." As the Supreme Court noted

[2] Exhibit 35:

HUMBLE OIL & REFINING COMPANY

1965 - 1968 Wisconsin Corporation Franchise Tax Audit

Comparison Of Net Income Of Total Company With Assessed Income From Wisconsin Operations

| Year | (1) Wisconsin Sales | (2) Wisconsin Assessed Taxable Income | Net Income Percentage Of Sales | (3) Total Company Sales | (4) Total Company Net Income Wisconsin Basis | Net Income Percentage Of Sales |
|---|---|---|---|---|---|---|
| 1965 | $12,980,144 | $ 759,371 | 5.9% | $3,462,675,348 | $403,594,652 | 11.6% |
| 1966 | 14,358,059 | 1,043,395 | 7.3% | 3,480,707,694 | 468,647,835 | 13.5% |
| 1967 | 16,350,330 | 1,264,946 | 7.7% | 5,720,832,181 | 541,954,615 | 14.6% |
| 1968 | 16,384,760 | 1,464,443 | 8.9% | 3,984,479,455 | 608,009,771 | 15.3% |
| Totals | $60,073,293 | $4,532,155 | 7.5% | $14,648,694,678 | $2,022,206,871 | 15.8% |

Notes:
1) From State Audit, Page 12 (Exhibit E-3) EXHIBIT #
2) From State Audit, Page 1 (Exhibit A-B) EXHIBIT #
3) See Computation Below
4) From State Audit, Page 2 (Exhibit C) EXHIBIT #

*3

| | 1965 | 1966 | 1967 | 1968 |
|---|---|---|---|---|
| Total Company Sales | $4,070,986,858 | $4,095,866,931 | $4,402,573,496 | $4,708,312,188 |
| Adjustments | | | | |
| 1. Taxes on Products Sold | (604,795,582) | (611,275,049) | (677,457,213) | (719,189,607) |
| 2. Cash Discounts | (3,518,128) | (3,884,188) | (4,284,102) | (4,643,126) |
| Total Adjusted Sales | $3,462,675,348 | $3,480,707,694 | $3,720,832,181 | $3,984,479,455 |

* From State Audit, Page 12 (Exhibit E-3) EXHIBIT #

in *Japan Line, Ltd., supra* at 4480, such benefits "include not only police and fire protection, but the benefits of a trained work force and the advantages of a civilized society."

The fact that the producing states may impose production taxes which are a form of property tax[3] or severance taxes which have been held to be occupation taxes or property taxes[4] does not render unfair or unconstitutional Wisconsin's efforts to reach a proportionate share of the taxpayer's income. As the Supreme Court stated in *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254 (1938):

"It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business, 'Even interstate commerce must pay its way.'"

QUESTION #3: IN APPLYING THE STATUTORY APPORTIONMENT FORMULA OF SEC. 71.07(2), STATS. (1967), DID THE DEPARTMENT PROPERLY WEIGHT THE COST OF MANUFACTURING FACTOR BY EMPLOYING A DIVISOR OF 2.6 INSTEAD OF 3?

Sec. 71.07(2), Stats., provides that after nonapportionable income is subtracted,

"The remaining net income shall be apportioned to Wisconsin on the basis of the ratio obtained by taking the arithmetical average of the following 3 ratios:

"(a) The ratio of the tangible property, real, personal and mixed, owned and used by the taxpayer in Wisconsin in connection with his trade or business during the income year to the total of such property of the taxpayer owned and used by him in connection with his

---

[3] Sullivan, *Handbook Of Oil & Gas Law* (Prentice-Hall, Inc. 1955) p. 490.

[4] Summers, *Oil & Gas* (Vernon Law Book Company, 1962) §801, p. 409.

trade or business everywhere. Cash on hand or in the bank, shares of stock, notes, bonds, accounts receivable, or other evidence of indebtedness, special privileges, franchises, good will, or property the income of which is not taxable or is separately allocated, shall not be considered tangible property nor included in the apportionment. In determining apportionable net income with respect to the calendar year 1964 and corresponding fiscal years and thereafter, in any case in which the property factor is distorted by the taxpayer depreciating property in Wisconsin by a method different from that used to depreciate property outside Wisconsin, the department may determine the property factor by depreciating all property by the same method, or using original cost of any other means as will achieve an equitable result:

"(b) In the case of persons engaged in manufacturing or in any form of collecting, assembling or processing goods and materials, the ratio of the total cost of manufacturing, collecting, assembling or processing within this state to the total cost of manufacturing, or assembling or processing everywhere. The term 'cost of manufacturing, collecting, assembling, or processing,' as used herein, shall be interpreted in a manner to conform as nearly as may be to the best accounting practice in the trade or business. Unless in the opinion of the department of taxation the peculiar circumstances in any case justify a different treatment, this term shall be generally interpreted to include as elements of cost the following:

"1. The total cost of all goods, materials and supplies used in manufacturing, assembling or processing regardless of where purchased.

"2. The total wages and salaries paid or incurred during the income year in such manufacturing, assembling or processing activities.

"3. The total overhead or manufacturing burden properly assignable according to good accounting practice to such manufacturing, assembling or processing activities.

"(c) In the case of trading, mercantile or manufacturing concerns the ratio of the total sales made through or by offices, agencies or branches located in

Wisconsin during the income year to the total net sales made everywhere during said income year."

Three factors are to be used in computing the apportionable income—sales, property and manufacturing costs. The Department weighted down the cost of manufacturing because not all of the products sold through Humble's marketing system in Wisconsin were manufactured by Humble.

Sec. 71.07 (2) (b) provides that

"Unless in the opinion of the department of taxation the peculiar circumstances in any case justify a different treatment, this term [cost of manufacturing] shall be generally interpreted to include as elements of cost the following. . . ."

The Department has employed weighting since 1932. Long-standing administrative construction of a statute is accorded great weight in the determination of legislative intent because the legislature is presumed to have acquiesced in that construction if it has not amended the statute. *Layton School of Art & Design v. WERC,* 82 Wis.2d 324, 340, 262 N.W.2d 218 (1978). The practice has also been approved by the Tax Appeals Commission and its predecessor, the Board of Tax Apppeals, in *Kroger Company v. Wisconsin Dept. of Taxation,* 4 WBTA 319 (1956), and *Cooper's Inc. v. Wisconsin Dept. of Revenue,* 9 WTAC 342 (1973). The subdivisions of the statute set forth statutory ratios for the apportionment method but give the department considerable latitude in adopting a formula which will most accurately reflect a reasonable and equitable tax on the income earned in Wisconsin. *Interstate Finance Corp., supra,* 28 Wis.2d at 271–72.

Exxon argues that the department lacked authority to adjust the apportionment ratios, because sec. 71.07 (5) provides:

"(5) If the income of any such person properly assignable to the state of Wisconsin cannot be ascertained with reasonable certainty by either of the foregoing methods, then the same shall be apportioned and allocated under such rules and regulations as the department of taxation may prescribe."

and the department had no published rules and regulations on the subject.

However, the department had sufficient authority to make such adjustments under sec. 71.07 (2) (b), without relying on sec. 71.07 (5).

The department, however, is not free to entirely disregard the statute. In *Department of Taxation v. Blatz Brewing Co.*, 12 Wis.2d 615, 108 N.W.2d 319 (1961), the department determined the location of returnable containers owned by Blatz for purposes of the property ratio by using the sales ratio. The court found this impermissible saying:

"The action of the board of tax appeals, in holding that in the absence of definite proof, the property factor should be based on sales, was arbitrary and capricious. It follows that the allocation of these containers on sales alone, as was done in the modified additional assessment and approved by the board, or on the basis of 50 per cent to sales and 50 per cent to manufacturing, as now contended by the department, cannot be sustained, because those contentions are based on an erroneous theory and ignore the weight of the property factor in the formula. Such contentions reduce the three-factor formula to a two-factor formula in this case. The department is bound to use the statutory method even though another method may appear convenient or expedient to it." *Id.* at 627.

In the instant case, it is concluded that Humble had no manufacturing in the state, so the numerator of the cost of manufacturing ratio is zero. For purposes of calculating the denominator of the ratio, the department

attempted to recognize only the cost of products manufactured by Humble and not those purchased from other vendors. To do this, the department used the ratio of net sales producing apportionable income to total manufactured products sold. This was improper under *Blatz*. We agree with the trial court that this question should be remanded to the Commission to determine whether the weighting method used by the Department was justified under the circumstances, and whether the formula as weighted unfairly apportioned the taxpayer's income for the years at issue. We also note that the burden of proving that the formula adopted unfairly apportioned Humble's income is on Exxon. *W. R. Arthur & Co. v. Dept. of Revenue,* 18 Wis.2d 225, 232, 118 N.W. 2d 168 (1962).

*By the Court.*—Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.