Leonard GREENE and Joyce Greene, Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

No. 91, Docket 93–6016.

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1993.

Decided Jan. 6, 1994.

Robert Sadowski, Asst. U.S. Atty. for the Southern District of New York (Gabriel W. Gorenstein, Asst. U.S. Atty., Roger S. Hayes, U.S. Atty. for the Southern District of New York, of counsel), for defendant-appellant.

Sheldon H. Elsen, New York City (Melissa A. Cohen, Orans, Elsen & Lupert, New York City, Richard A. Sporn, Gerald & Lawrence Blumberg, New York City, of counsel), for plaintiffs-appellees.

Before: FEINBERG, CARDAMONE, and ALTIMARI, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal concerns the tax consequences arising from taxpayers' charitable donation of futures contracts while retaining the right to a portion of the income from the subsequent sale of the contracts by the charity. Its resolution requires us to revisit a line of cases beginning with *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930), and relied upon in *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940), to determine whether the district court properly treated the taxpayers' donation as a gift of "the tree," with a retained right to some of "the fruit," rather than, as the government believes, a gift of some of the fruit, with taxpayers maintaining possession of the tree.

In asserting this view of the transaction the government takes the actual facts as found by the district court and insists that we take the record not on those facts, but on its proposed fictitious, hypothetical facts. Were we to examine the taxpayers' charitable plans as the government wants us to, the taxpayers' gifts to charity would result in taxable income. The government's point comes down to this: if the facts were different than they are, the government might succeed on this appeal. But since the facts are what they are, we affirm.

## BACKGROUND

Leonard and Joyce Greene, husband and wife, founded the Institute for Socioeconomic Studies, Inc. (Institute), a tax-exempt private foundation, in the early 1970s. Leonard Greene served as its president and as a member of its board of directors. In 1974 the Greenes requested a letter ruling from the Internal Revenue Service (IRS) with respect to the tax consequences of their proposed plan to contribute futures contracts to the Institute. The IRS advised them that if they transferred all their equitable rights and interests in the contracts to the Institute, executed an irrevocable power of attorney granting the Institute power to determine when and if the contracts were to be sold, and provided that all proceeds of the sale of the contracts would be paid by the commodity exchange directly to the Institute, they would be entitled to a charitable deduc-

tion on their joint tax return in the amount of the fair market value of the contracts, and would not be charged with realizing a gain or loss on the sale. Under the plan approved by the IRS the taxpayers were allowed to retain legal title to the contracts because the New York Commodity Exchange would not recognize, except on the floor of the Exchange, the transfer of futures contracts to third parties. Between 1974 and 1980 the Greenes made donations, following the terms of the private letter ruling, and reported on their tax returns charitable contributions equal to the fair market value of the contracts at the time when they were donated.

In 1981 Congress amended § 1256 of the Internal Revenue Code (Code) to combat perceived tax abuses by commodities traders who structured their trading to defer recognition of income to future years or to convert the character of the income realized from short-term income to long-term capital gain. The amendments required that all commodities futures contracts acquired and positions established after June 23, 1981 be marked to market at year-end and the gains or losses, regardless of how long the contracts had been held, be characterized as 60 percent long-term and 40 percent short-term capital gains or losses. *See* 26 U.S.C. § 1256(a) (1988). Section 170 of the Code does not permit a charitable donation deduction for the value of donated property that would have been a short-term gain to the taxpayer had the taxpayer sold the property. *See* 26 U.S.C. § 170(e)(1) (1988).

The effect of § 1256 and § 170 on the Greenes was that were they to continue donating their entire interest in futures contracts to the Institute, they would only be entitled to claim a charitable deduction for 60 percent of the contracts' fair market value—the amount equal to the long-term gain portion. In light of this, the taxpayers changed the manner in which they made their contributions. Rather than conveying "all of his right, title and interest in" the futures contracts he wished to donate, as in previous years, Leonard Greene only conveyed "all of his right, title and interest in the long term capital gain of the futures contracts" to the Institute, specifically retaining for himself

the short-term capital gain. The other provisions of the 1982 donation agreement remained substantially the same as in the previous years' agreements, delivering an irrevocable power of attorney for the contracts to the Institute's trustee, giving the trustee absolute and complete discretion to determine when and if to sell the contracts, and stating that as a result of the agreement, he would no longer have any "control" (prior agreements used the word "interest") in the contracts.

Leonard Greene—who principally participated in the transactions at issue though he and his wife filed a joint income tax return for the year 1982 and are both parties to this litigation—chose the selected futures contracts according to the unrealized gains in them as well as the funding needs of the Institute. The contracts were then transferred to a special account held with the brokerage firm of Merrill Lynch Pierce Fenner & Smith (Merrill Lynch) over which Greene had given power of attorney to the trustee of the Institute. The donated contracts were sold the same day or shortly after each gift was made, as there was a standing instruction from the Institute's trustee to Merrill Lynch to sell immediately any futures contracts donated by Greene. That part of the proceeds representing the long-term capital gains was transferred to the Institute's account, and the part representing the short-term capital gains was transferred to Greene's personal account. The Greenes reported and paid income taxes on the short-term capital gains and took a deduction for their charitable donation of the long-term capital gains to the extent allowed under the Code.

In September 1990 the IRS sent the taxpayers a notice of deficiency for the tax year 1982. It had determined that the full fair market value of the contracts should be included in their 1982 taxable income. It also disallowed the Greenes' deductions for the years 1983 through 1987 claimed as carryforwards for the excess over the maximum charitable deduction allowed in 1982. Appellees paid the deficiency and filed a claim for a refund with the IRS. It was disallowed. In May 1991 taxpayers filed the instant suit for

a refund in the United States District Court for the Southern District of New York (Goettel, J.). Both sides moved for summary judgment. The district court granted the Greenes' motion and ordered the requested refund on November 25, 1992.

On appeal, the government contends the wrong legal standard for determining whether the donation was an anticipatory assignment of income was applied. It also maintains it was error for the trial court not to apply the step transaction doctrine to the subject donation. In addition, the government urges—for the first time on appeal—that § 1256(c) of the Code provides an independent ground for reversal because that section requires taxpayers to report the entire amount of gain in a commodity futures contract whenever such is transferred, including those that are donated to a charity. In the discussion that follows, we address each of these issues.

## DISCUSSION

A grant of summary judgment is reviewed *de novo* on appeal to determine if there are genuine issues of material fact. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Summary judgment is appropriate when no such issue is found and when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The government does not contend that there is a genuine issue of material fact requiring trial; it can hardly do so considering it too moved for summary judgment. The issue is whether Judge Goettel correctly applied the controlling law to the facts of this case. We think he did.

When a charitable donation is property other than money, the amount of the contribution is the fair market value of the property at the time of the donation. *See* 26 C.F.R. § 1.170A–1(c)(1) (1993). Futures contracts are property for income tax purposes. *See, e.g., S.C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778, 784, 1975 WL 3062 (1975). A charitable gift of property appreciated with a capital gain may be claimed as a deduction in an amount equal to the proper-

ty's fair market value, subject to a limit of 30 percent of the taxpayer's adjusted gross income. 26 U.S.C. §§ 170(b)(1)(C)(i), 170(b)(1)(F) (1988). No taxable gain is recognized by the donor when the entire interest in the appreciated capital gain property is transferred to a qualified charity. *See Grove v. Commissioner,* 490 F.2d 241, 246 (2d Cir. 1973). But, when appreciated property is sold and the proceeds are later donated to charity, the donor must recognize the gain, if any, as income. *See* 26 U.S.C. § 61 (1988). In such a case, the charitable deduction equals only the actual amount of cash donated subject to a limit of 50 percent of the taxpayer's adjusted gross income. *See* 26 U.S.C. §§ 170(a), 170(b) (1988).

The government insists that under either the anticipatory assignment of income doctrine or step transaction doctrine, the Greenes' 1982 donation should be treated as a sale of the futures contracts followed by a gift to charity of the long-term gain proceeds of the sale. Our discussion turns to an analysis of these two doctrines.

## I Anticipatory Assignment of Income Doctrine

■ It is a central tenet of tax law that tax liability depends upon the substance not the form of a transaction. *See, e.g., Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945); *Grove,* 490 F.2d at 245. The substance of the subject transaction consisted of a gift of appreciated property with a retained right by the Greenes to a portion of the income. It was not a gift of a right to the proceeds following a sale of a futures contract, as argued by the government. Although a provision of the 1982 donation agreement stated that the gift was "a contribution of only the long term capital gain of [the] future contracts," the substance of the donation was the same as it had been in previous years, a scenario that the IRS had previously determined was a gift of property. The only difference in the gift in the year 1982 was that the Greenes retained a right to that portion of income from the property which, under the amended Code provisions, was no longer deductible. Taxpayers gave away just

as much of their property interest in the futures contracts in 1982 as they had for the prior eight years. They continued giving the Institute absolute control over the contracts and complete discretion to determine when and if to sell the contracts. There was no more "property" in the futures contracts that they could have given the Institute.

■ As first enunciated by the Supreme Court in 1930, the anticipatory assignment of income doctrine holds that income is taxable to the person who earns it, and that such taxes cannot be avoided through "arrangement[s] by which the fruits are attributed to a different tree from that on which they grew." *Lucas v. Earl,* 281 U.S. at 115, 50 S.Ct. at 241 (husband's salary is income to him and therefore taxable to him notwithstanding a contract with his wife under which all of their earnings were to be held by both as joint tenants). Ten years later the Supreme Court ruled that this reasoning applied in the case of a gift of interest coupons clipped from negotiable bonds, delivered to a donee and in the same year paid at maturity. The Supreme Court held that this results in realization of income taxable to the donor, who created the right to receive the income and who enjoyed its benefits when paid. *See Helvering v. Horst,* 311 U.S. at 120, 61 S.Ct. at 148. As stated today, the anticipatory assignment of income doctrine provides that when a taxpayer has rights in the proceeds of donated property, and those rights have so matured or ripened that the taxpayer is entitled to the gain, he or she must pay a tax on those proceeds even though purporting to transfer the property to someone else. *See Morgan Guar. Trust Co. v. United States,* 585 F.2d 988, 994 (Ct.Cl.1978). Thus, the next question for analysis is whether the Greenes had a fixed right to the income from the futures contracts. If a fixed right to income had matured at the time the transfer was made, the proceeds are considered income to the Greenes irrespective of the purported donation.

The assignment of income doctrine is applied on a case-by-case basis. The Supreme Court states that one who, firmly entitled to receive income, makes an anticipatory gift of it is taxable just as though he had received it

and later given it away. *See Harrison v. Schaffner*, 312 U.S. 579, 580, 61 S.Ct. 759, 760, 85 L.Ed. 1055 (1941). The government believes the district court incorrectly viewed the assignment of income issue as turning solely on whether the Institute or Greene had the power to determine when the gain in the futures contracts would be realized. The relevant question, it suggests, is whether the income donated was a fixed right to income— such as bond coupons—or was a mere expectancy of profit that may be earned from a future sale—like an unrestricted gift of real property. Contrary to the government's assertion, Judge Goettel addressed this very issue: "In this case, the question becomes whether Greene's interests in the short-term capital gains had matured to the point where one could say that he had a right to the gain." *Greene v. U.S.*, 806 F.Supp. 1165, 1168 (S.D.N.Y.1992).

■ The district court correctly determined that the Greenes had no fixed right to income in the donated futures contracts. Although the couple retained the right to any short-term capital gains resulting from the sale of the futures contracts—and, as stated, the donated contracts were in fact immediately sold by the Institute resulting in the realization of gain—it was not certain that such short-term gains would be realized. There was no express condition on the gift that the Institute sell the contracts, nor was there any informal agreement to do so. At the time they were donated the contracts' values were appreciated, but the commodities futures market is volatile and there was no understanding that the Institute would sell them before their value declined. Given the market volatility, it would have been reasonable for the Greenes to suppose that the Institute would sell the contracts soon after they were donated. But, when deciding whether a charitable donation of futures contracts constitutes an assignment of income, it is not the mere anticipation or possible expectation of income that causes the donor to be liable for taxes on such income. *See S.C. Johnson & Son, Inc.*, 63 T.C. at 786. More than expectation or anticipation of income is required before the assignment of income doctrine applies. *See Morgan Guar. Trust Co.*, 585 F.2d at 994. Hence, the charitable donation of appreciated futures contracts is not by itself an assignment of income.

■ Yet, even where a donor of property has no fixed right to income, the anticipatory assignment of income doctrine still may have effect. For example, it governs in those cases where the donor retains sufficient power and control over the property or receipt of the income to make it reasonable to treat the donor as the recipient of the income for tax purposes, *see Commissioner v. Sunnen*, 333 U.S. 591, 604, 68 S.Ct. 715, 722, 92 L.Ed. 898 (1948), because having the power to dispose of the income gives the taxpayer the benefit of its enjoyment, *see Harrison*, 312 U.S. at 582, 61 S.Ct. at 761.

The trial court found the evidence could support no conclusion other than that the Greenes maintained no control over the sale of the donated futures contracts. Leonard Greene's being president of the Institute and a member of its board of directors properly was found insufficient to constitute control. *Cf. S.C. Johnson & Son, Inc.*, 63 T.C. at 789 (corporation that donated futures contracts to charity that it established and whose trustees were all officers of the corporation did not realize income as a result of contribution and subsequent sale absent evidence of overreaching or breach of fiduciary duty). Since Greene did not retain any control over the contracts after they were donated, this case is distinguishable from those where an anticipatory assignment of income has been found based on the assignor's continued control over the income. *See Sunnen*, 333 U.S. at 608, 68 S.Ct. at 724 (anticipatory assignment of income where husband assigned license contracts to wife but retained substantial interests in the contracts themselves, as well as the power to control the payment of royalties to his wife).

This case is also distinguishable from the line of cases in which the assignor transferred by contract a right to a portion of income to be earned by the assignor. *See, e.g., Lucas*, 281 U.S. at 114–15, 50 S.Ct. at 241. Here, once the contracts were assigned to the Institute, the Greenes had no control over whether the Institute received any income from them, or how much it would re-

ceive upon a subsequent sale. As a consequence, the taxpayers may not be deemed under the anticipatory assignment of income doctrine to have realized income on the futures contracts after they were sold by the Institute.

## II Step Transaction Doctrine

■ The next claim of error by the government is the trial court's failure to apply the step transaction doctrine. By emphasizing substance over form, the step transaction doctrine prevents ·a taxpayer from escaping taxation. The doctrine treats the "steps" in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. *See Penrod v. Commissioner*, 88 T.C. 1415, 1428, 1987 WL 49335 (1987). Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan. *See Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, ·1244 (5th Cir.1983). Of course, the doctrine cannot manufacture facts that never occurred to create an otherwise non-existent tax liability. *See Grove*, 490 F.2d at 247–48. The government maintains that under either the "end result" test or the "interdependence" test of this doctrine the Greenes' donation of appreciated futures contracts should be disregarded, and the transaction treated as a sale by them of the contracts, followed by a gift of a portion of the cash proceeds to the Institute.

## A. The "End Result" Test

■ Under the end result test, the step transaction doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result. *See Penrod*, 88 T.C. at 1429. The government avers this test controls because the intention and end result of the taxpayers' scheme was to liquidate certain futures contracts and then to distribute the proceeds to themselves and to the Institute for its use as operating revenues, while avoiding tax liability for the long-term gains on the contracts.

For the government's characterization of the transaction to be accurate, the record facts would have to demonstrate that a pre-arranged plan for disposition of the futures contracts existed. *See Blake v. Commissioner*, 42 T.C.M. ·(CCH) 1336, 1351, 1981 WL 11142 (1981), *aff'd*, 697 F.2d 473 (2d Cir. 1982); *see also Kinsey v. Commissioner*, 477 F.2d 1058, 1062–63 (2d Cir.1973). Further, although the arrangement to sell the donated property need not be a legally binding one, there must at least be a showing of an informal agreement or understanding between the parties. *See Blake*, 697 F.2d at 478–79. As we observed when evaluating the anticipatory assignment of income issue, there simply is no evidence of a prearranged plan between Greene and the Institute for selling the futures contracts immediately upon receipt.

In effect, the government's argument boils down to an attempt not to recharacterize several separate transactions as a whole one, but to describe two actual transactions as two hypothetical ones. Specifically, appellant urges that a donation followed by a sale by the donee is really a sale by the donor followed by a donation. In this fashion, the government turns fact·into fiction.

Such an attempt to generate events that never took place under the rubric of a step transaction was rejected in *Grove*, 490 F.2d at 247.–48. There the taxpayer donated stock for several years to a tax-exempt institution, his college, but retained a life estate in any income produced by the stock. *Id.* at 243. Each year the stock was redeemed by the corporation of which Grove was president, and the proceeds were invested in income producing securities, by the college, which income was later paid to the donor Grove. *Id.* at 245. The Commissioner thought the actual form of the donations and redemptions should be disregarded and treated instead as a redemption of Grove's stock, followed by a cash gift to the· institution. *Id.* We did not adopt this script, stating instead that while taxes obviously played a part in Grove's arrangement, tax planning alone could not transform a non-taxable event into a taxable event. *Id.* at 247. Accepting the Commis-

sioner's position would have recharacterized two actual events into two invented ones. *Id.*

There is even less basis to recharacterize taxpayers' donation here. In *Grove,* the institution was required as a condition of the gifts to offer the shares for redemption to the donor's corporation. As a majority shareholder, Grove had control over whether the shares would be redeemed. *Id.* Thus, there was arguably a "plan" of redemption achieved through the donations. In the case at hand, as already stated, there was no evidence of a prearranged plan that the Institute would sell the futures contracts and taxpayers had no control over whether or not the Institute did so. Thus, the charitable plan at issue here was not a prearranged scheme of purportedly separate steps, or in actuality a single transaction so as to trigger the end result test of the step transaction doctrine.

### B. The Interdependence Test

■ The interdependence test is a variation of the end result test. *See Penrod,* 88 T.C. at 1430. It focuses on whether the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *American Bantam Car Co. v. Commissioner,* 11 T.C. 397, 405, 1948 WL 50 (1948), *aff'd,* 177 F.2d 513 (3d Cir.1949), *cert. denied,* 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950). To apply this test, a court must determine whether the individual steps had "independent significance or whether they had meaning only as part of the larger transaction." *Penrod,* 88 T.C. at 1430.

■ The government declares there was no independent consequence from giving the Institute unsold contracts because the admitted purpose of the donation—funding the Institute's operations—could not be met until the contracts were sold. Additionally, it asserts the donation had no independent significance because the amount of the charitable contribution could not be determined until the contracts were sold, and that the Greenes' retention of the short-term capital gains would similarly be of no consequence unless the contracts were sold.

This argument falls far short of being compelling. First, the Greenes' donations were not intermediate or transitory steps in some overarching plan. The donations had the "independent significance" of providing the Institute with investment property and control over the decision of whether to hold on to the property in anticipation that its value would increase, or to sell the property in order to have immediate access to funds. The fact that the Institute could not use the gift for its operating revenues without a sale does not make the gift of the contracts of no independent significance and therefore subject to the step transaction doctrine. If it did, then all charitable donations of appreciated property would result in tax liability if the charity later sold the property. It would be naive not to recognize that whenever a gift of appreciated property is made to a charity it can be anticipated that the property will be sold, because "[o]nly through such a step [can] the purpose of the charitable contribution be achieved." *S.C. Johnson & Son, Inc.,* 63 T.C. at 789. Accordingly, the result urged by the government is directly in conflict with the well-established rule that a gift of appreciated property does not result in income to the donor. *See, e.g., Grove,* 490 F.2d at 246; *Sheppard v. United States,* 361 F.2d 972, 977–78 (Ct.Cl.1966).

Second, the government's view that the amount of the deduction could not be determined until there was a sale is also without substance. It is well settled that the amount of a charitable deduction is determined by the fair market value of the property on the date of the donation, reduced according to other Code provisions. 26 C.F.R. § 1.170A–1(c)(1) (1993); *McGuire v. Commissioner,* 44 T.C. 801, 806, 1965 WL 1207 (1965). Third, while the government correctly asserts that the Greenes' retention of a right to the short-term gains on the donated contracts would have been of no consequence unless the contracts were sold, this sort of dependence in the circumstances of this case does not trigger the application of the interdependence test. As stated, that test focuses on whether each step in a series of transactions would have been fruitless had not the subsequent steps occurred. The relevant issue therefore is not whether the Greenes' retention of a

right to the short-term gains would have had significance absent a sale of the contracts, but rather whether the sale by the Institute would have had significance absent the Greenes' being entitled to the short-term gains from the sale. We have no doubt that the sale of the futures contracts by the Institute was a wholly independent event, possessing significance separate from the Greenes' retention of a right to the short-term gains. The sale of these contracts was the means by which the Institute converted the gift of property into operating funds. The Institute's decision to sell those futures contracts was driven by its own needs, as to which the requirement that in the event of a sale it turn over part of the proceeds to the Greenes was irrelevant.

Moreover, this case is distinguishable from those in which the interdependence test has been met. For example, in *Blake v. Commissioner,* a taxpayer donated appreciated stock to a charity with an understanding that the charity would liquidate the stock and purchase the taxpayer's yacht. *See* 697 F.2d at 478–79. We applied the step transaction doctrine to disregard the initial gift of the stock, and treated the transaction as a gift of the yacht. *Id.* at 480. Here, in contrast, taxpayers made a substantial gift to the Institute and received nothing in return. They retained a right to a portion of the income from the contracts, but giving a partial gift is quite different from giving away something with an understanding that the donee will later buy something back from the donor with the proceeds of the donated gift. There was no understanding that the Institute would handle the contracts or the donated portion of the proceeds from sale in any way that would benefit the Greenes. In fact, they were not benefited by the charity.

Further, the interdependence test has been applied almost exclusively in cases involving complicated corporate transactions. *See, e.g., Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d 1517 (10th Cir. 1991) (merger and reorganization followed by transfer of subsidiary treated as complete liquidation); *Security Indus. Ins. Co. v. United States,* 702 F.2d 1234 (5th Cir.1983) (acquisitions and reorganizations followed by transfer treated as complete liquidations); *McDonald's Restaurants of Illinois, Inc. v. Commissioner,* 688 F.2d 520 (7th Cir.1982) (merger and stock transfer followed by sale of stock treated as liquidation); *South Bay Corp. v. Commissioner,* 345 F.2d 698 (2d Cir.1965) (purchase of controlling interest in corporations followed by merger into principal corporation treated as purchase by principal corporation of controlling interests); *King Enters., Inc. v. United States,* 418 F.2d 511 (Ct.Cl.1969) (stock acquisition followed by merger treated as reorganization).

In all of these cases the individual steps taken by the taxpayers obscured the actual character of a corporate change. For example, in *Kuper v. Commissioner,* 533 F.2d 152 (5th Cir.1976), shareholders of a realty-owning corporation contributed all of their shares to an automobile dealership corporation owned by the same shareholders. The automobile corporation made a cash capital contribution on the same day to the realty corporation, and on the following day the automobile corporation exchanged the realty corporation's shares for one stockholder's one-third ownership of the automobile corporation. *Id.* at 154. The Fifth Circuit agreed with the tax court's finding that these transactions were mere steps to disguise a stock-for-stock transaction at the shareholder level, and therefore it treated the steps as a taxable exchange of stock. *Id.* at 156.

Unlike these cases, the present taxpayers did not undertake a series of steps according to an overall plan in order to obscure the character of the transaction. Their only "plan" was to make a contribution to the Institute and retain for themselves the right to a portion of any income from the donated contracts, should they be sold. This is exactly the transaction that took place. Hence, the interdependence test was not met, and the step transaction doctrine is inapplicable to this case.

III Application of 26 U.S.C. § 1256(c)

 Finally, the government raises for the first time on appeal an argument that in any transfer of futures contracts, including a charitable donation, § 1256(c) of Title 26 requires taxpayers to recognize the entire

amount of gain inherent in commodity futures contracts whenever they are transferred. To begin, it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). This rule is not an absolute bar to raising new issues on appeal; the general rule is disregarded when we think it necessary to remedy an obvious injustice. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 527 (2d Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990). We will also sometimes entertain arguments not raised in the trial court if the elements of the claim were fully set forth and there is no need for additional fact finding. *See Vintero Corp. v. Corporacion Venezolana de Fomento,* 675 F.2d 513, 515 (2d Cir.1982). Entertaining issues raised for the first time on appeal is discretionary with the panel hearing the appeal.

The government asks us to construe a 1981 statute. This task would require a thorough investigation of the legislative history of the statute, as well as the applicable case law. In its brief the government discusses the application of § 1256(c) in less than three pages, and at oral argument it did not mention the issue. No reason is offered by the government for the failure to raise it below, nor does it suggest that there will be any great injustice if we refuse to resolve it. Therefore, we decline the invitation to address this issue.

CONCLUSION

Accordingly, for the reasons stated, the judgment appealed from is affirmed.