699 A.2d 461

**HERCULES, INCORPORATED**

v.

**COMPTROLLER OF THE TREASURY.**

**No. 699, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Sept. 3, 1997.

Motion for Reconsideration Denied August 28, 1997.

32

Stuart Levine (Eric M. Newman and Fisher & Winner, L.L.P., on the brief), Baltimore, Paul H. Frankel (Morrison & Foerster, L.L.P., on the brief), New York City, for Appellant.

Gerald Langbaum, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and John K. Barry, Assistant Attorney General, on the brief), Annapolis, for Appellee.

Argued before MOYLAN, EYLER and THIEME, JJ.

EYLER, Judge.

This case requires us to apply well established principles of law with respect to the constitutional limitations on Mary-

land's ability to subject earnings of a non-domiciliary corporation to its corporate income tax.

## Facts

On June 3, 1991, Hercules, Inc., appellant, filed an amended Maryland income tax return for the year 1987, claiming a refund of corporate income tax in the amount of $132,562, the amount of tax previously paid on income derived from its sale of stock in a corporation known as HIMONT, Inc. On October 21, 1992, the Comptroller of the Treasury, appellee, denied the refund claim. Appellant appealed to the Maryland Tax Court; that court affirmed the denial of the refund on January 3, 1995. On January 27, 1995, appellant filed a motion to reconsider and a motion requesting withdrawal of the opinion and order. The Tax Court withdrew its order and opinion of January 3, pending consideration of the motion for reconsideration. On March 16, the Tax Court struck its January 27 order, reinstated its January 3 order, denied the motion to withdraw the prior opinion and order, and denied the motion for reconsideration. On March 24, 1995, appellant filed a petition for judicial review in the Circuit Court for Baltimore City. Appellee filed a motion to dismiss the petition on the ground that it had not been timely filed. After a response by appellant and a hearing, the circuit court denied the motion. On March 8, 1996, the circuit court affirmed the Tax Court's decision on the merits. This appeal and cross-appeal followed.

The record in the Tax Court consisted of a stipulation between the parties, exhibits, and the testimony of Mr. Maynard Turk, vice-president and general counsel of appellant and a director of Himont. The parties stipulated to the following:

*Introduction*

1. At all times relevant to the present action, Hercules, a Delaware corporation, had its principal place of business in Wilmington, Delaware. Hercules' principal business activity in Maryland was the sale of industrial chemicals to customers in Maryland. These sales constituted a part of Hercules' total taxable income apportionable to Maryland.

2. During 1983, Hercules Incorporated ("Hercules") was organized into three (3) operating divisions: (1) Hercules Specialty Chemicals Company; (2) Hercules Aerospace Company; and (3) Hercules Engineered and Fabricated Products Company which later changed its name to Hercules Engineered Polymers Company ("HEPC").

3. The activities of Hercules had previously included manufacturing polypropylene resin as part of HEPC. Polypropylene resin is the raw material used in the manufacture of, *inter alia,* film for packaging, film products, and fibers.

4. Both Hercules and Montedison S.P.A., an Italian corporation ("Montedison"), had the technology to produce polypropylene resin.

5. However, unlike Montedison, Hercules failed to keep up with the technological changes in the field of polypropylene manufacturing.

6. By 1983, Hercules had concluded that the manufacture of polypropylene resins no longer fit into its strategic plans and commenced to disengage from the business. It developed a course of action designed to reduce its exposure to petrochemical commodities by strategically changing from a commodity based chemical company to a specialty chemical company.

7. Even after making the determination to dispose of its polypropylene resin manufacturing business, Hercules required polypropylene resins for use in its other business operations.

8. Even while engaged in the manufacture of polypropylene resins, Hercules obtained polypropylene resins from other sources.

9. Subsequent to the formation of HIMONT, Hercules obtained polypropylene resins both from HIMONT and from other sources.

10. The sale of polypropylene resins amounted to 14%, 16%, and 15% of Hercules' consolidated net sales for the years 1983, 1982, and 1981, respectively.

11. In early 1983, Hercules approached Montedison with the concept of forming a new company to manufacture polypropylene resin. As a result of these negotiations, the parties formed a joint venture pursuant to a joint venture agreement, dated June 28, 1983 (the "Joint Venture Agreement"). *See* Exhibit 1 of the Joint Exhibits. Pursuant to the Joint Venture Agreement, Hercules and Montedison contributed all of their polypropylene resin manufacturing assets to HIMONT to manufacture polypropylene resins. The goal of the joint venture was to marry the marketing abilities of Hercules with the advanced technology of Montedison in a new company.

12. In the Joint Venture Agreement, Hercules and Montedison agreed that each would own fifty percent (50%) of all HIMONT stock.

13. In 1983, Hercules expected that by utilizing the latest generation of high-yield, polymerization catalyst and advanced polymerization technology developed, in part, by Montedison, HIMONT should be the lowest cost producer of polypropylene resins on a world scale, geographically diversified basis.

14. There was no use by Hercules or Montedison of HIMONT's corporate plants or vice versa.

15. Until HIMONT was able to supply or build its own office facilities, Hercules and Montedison leased office space to HIMONT. Except for that lease, Hercules did not rent or lease any property to HIMONT and HIMONT did not rent or lease any property to Hercules.

16. When HIMONT was first created, it contracted for certain administrative services from Hercules and Montedison pursuant to a series of written agreements (collectively referred to herein as the "Services Agreement"). *See* Exhibits 10 and 11 of the Joint Exhibits. The reason for this was that HIMONT needed time to hire, train and staff a complete administrative structure.

17. As time went on, the services provided to HIMONT by Hercules diminished as HIMONT built-up its adminis-

trative structure. The actual provision of services to HIMONT by Hercules did not fully end, however, until a year after Hercules disposed of its stock in HIMONT.

18. Hercules and Montedison provided HIMONT with accounting services, contracting services, payroll services, and insurance services. HIMONT would decide what services it needed and made the policy decisions. Hercules and Montedison then supplied the manpower on a subcontracting basis to implement the decisions made by HIMONT.

*Operation of HIMONT*

19. Pursuant to the Joint Venture Agreement, HIMONT was formed on November 1, 1983. As required by the terms of the Joint Venture Agreement, Hercules contributed all of its polypropylene manufacturing assets, technology and business, including its plants located in Lake Charles, Louisiana, and Bayport, Texas to HIMONT in exchange for its fifty percent (50%) interest. These polypropylene manufacturing assets constituted all of the operating assets of Hercules' polypropylene business. At the same time, Montedison contributed all of its polypropylene manufacturing assets to HIMONT.

20. Pursuant to the Joint Venture Agreement, HIMONT distributed to Hercules a promissory note in the original principal amount of Seventy Million Dollars ($70,000,-000.00)(the "Equalization Note") designed to equalize the relative value of the operating capital contributions made by Hercules and Montedison due to the fact that Hercules' operating capital contribution exceeded Montedison's operating capital contribution. The note was payable in five years at variable interest rates which were commercially competitive.

21. After the formation of HIMONT, Hercules no longer had any facilities, personnel, or technology to engage in, nor did it engage in, the business of manufacturing polypropylene resin and HEPC ceased to operate in that line of business. HEPC continued its film and fiber manufacturing lines.

*Finance*

22. Hercules did not provide HIMONT with financing, nor did Hercules guarantee loans made to HIMONT. There were no loans at any time between Hercules and HIMONT and there were no joint borrowings by Hercules and HIMONT.

23. In addition to the Joint Venture Agreement, the affairs of HIMONT were governed by a shareholders' agreement between Hercules and Montedison (the "Shareholders' Agreement"). *See* Exhibit 2 of the Joint Exhibits.

*Employees*

24. From the time of its inception, HIMONT had its own research, sales, marketing and manufacturing personnel. All personnel who were employees of Hercules in the polypropylene manufacturing line of business at the time of the formation of HIMONT were terminated by Hercules and hired by HIMONT. Those employees were told that they would have "no bridge" back to Hercules. At no time was any Hercules employee or officer at the same time an employee or officer of HIMONT.

25. At the time of the public offering of HIMONT's stock in February, 1987, HIMONT employed 2,800 people overall and 175 marketing and sales personnel.

26. At the time of the initial formation of HIMONT, both Hercules and Montedison were entitled to appoint three (3) directors to HIMONT's six (6) member board of directors. Except for the three (3) individuals appointed to the HIMONT board by Hercules who served HIMONT solely in their capacities as directors, there were no common officers, or employees between the two companies.

27. After HIMONT made its initial public offering in February of 1987, its Board of Directors was expanded to nine (9) members. Thereafter, Hercules continued to have the right to appoint three (3) members of the Board of Directors.

28. Hercules did provide to HIMONT certain administrative Services pursuant to the terms of the Services

Agreement, as noted in paragraphs 16 and 17 of this Stipulation.

29. Section 7(b) of the Shareholders' Agreement provided that for five years after October 31, 1983, Hercules would select and, if appropriate, dismiss the President of HI-MONT, in each case with the concurrence of the Board of Directors.

30. Section 7(c) of the Shareholders' Agreement provided that Montedison would nominate the Vice Presidents for Business Management and for Technology and that Hercules would nominate HIMONT's Vice-Presidents for Financial Accounting and Administration. The head of European operations and a key employee in HIMONT's financial area would be nominated by Montedison and the head of North American Operations would be nominated by Hercules.

31. Section 7(d) of the Shareholders Agreement, provided that key officials of HIMONT would be selected by HIMONT's president following consultation with Hercules and Montedison, drawing from the pool of executive talent associated with the business to be contributed or, if necessary, from outside of Hercules and Montedison. The Shareholders' Agreement further provided that employees were to be selected on the basis of merit and no employee of HIMONT would, at the same time, be employed by or receive any compensation from Hercules or Montedison or any of their subsidiaries other than pension or retirement benefits or deferred compensation arrangements. Hercules and Montedison agreed to use good faith efforts to make such employees available so that HIMONT would have the maximum opportunity to function as a viable and efficient entity.

32. HIMONT had its own bonus plan, savings and investment plan, incentive plan, defined benefit pension plan, restricted stock plan and stock option plan. Employees who had been employees of either Hercules or Montedison prior to the formation of HIMONT were given credit under these plans for their years of service to either of those companies.

33. HIMONT had personnel and employee policies that were separate from those of Hercules.

*Sales and Purchases of Products Between Hercules and HIMONT*

34. The percentages of net sales by HIMONT to Hercules compared to the total net sales by HIMONT and the amounts of those sales were as follows:

| Year | Percentage of Net Sales of HIMONT to Hercules Compared to Total HIMONT Sales | Amount of Total HIMONT Sales to Hercules (In Millions) |
|------|------|------|
| 1984 | 12.8% | $117.2 |
| 1985 | 12.9% | $117.2 |
| 1986 | 12.4% | $121.6 |
| 1987 | 12.5% | $146.0 |
| 1988 | 7.8% | $133.4 |

35. Hercules continued to make purchases from HIMONT even after Hercules disposed of its interest in HIMONT.

*Sale of HIMONT*

36. At the time of the formation of HIMONT, Hercules and Montedison contemplated the eventual public offering of the common stock of HIMONT on the New York Stock Exchange.

37. HIMONT was taken public in February, 1987, thereby allowing the markets to value HIMONT. The initial offering price was $28 per share.

38. HIMONT raised in excess of $379,000,000.00 in that offering.

39. On September 25, 1987, Hercules sold its entire interest in HIMONT to Montedison for $59.50 per share, for net proceeds of $1,487,500,000.00. Hercules' efforts over the years, from 1983 to 1987, in disposing of this major element of Hercules benefitted Hercules in terms of enhanced expansion into value added, growth oriented areas of the chemical industry. These are businesses in which Hercules has greater influence over its destiny because they are based on technology, rather than raw material position.

*Procedural Issues*

40. Hercules had timely filed its 1987 Maryland Corporation Income Tax Return. Joint Exhibit 15. On or about June 3, 1991, Hercules made a claim for refund of Maryland Corporation Income Tax previously paid, by filing an amended Maryland Corporation Income Tax Return for 1987 (the "Amended Return"). The Amended Return was timely filed and excluded the income derived from the sale of the HIMONT stock which had previously been reported by Hercules for 1987. The refund claim was for $132,-562.00. Joint Exhibit 16.

41. On October 21, 1992, the Income Tax Division, Office of the Comptroller denied the claim for refund filed by Hercules Incorporated.

42. This appeal was timely filed.

43. The sole issue in this case is whether the income derived from the sale of the HIMONT stock which had previously been reported by Hercules for 1987 should have been excluded when calculating the Maryland Corporation Income Tax due from Hercules in that year.

44. The Joint Exhibits are admissible into evidence without objection.

We will refer to the exhibits and to the testimony as necessary in our discussion of the issues.

## Questions Presented

Appellant states:

The sole issue before this Court is whether the Maryland Tax Court erred when it determined that the State of Maryland had the Constitutional power to tax Hercules on the profit from the sale of its minority interest in HIMONT, a publicly traded corporation, even though (1) Hercules was not a domiciliary of the State of Maryland, (2) Hercules did not control HIMONT, (3) HIMONT was functionally independent from Hercules, (4) HIMONT was not engaged in a unitary business with Hercules, and (5) the ownership of

HIMONT stock by Hercules played no operational role in Hercules' active business enterprises.

Appellee presents the same issue differently. We quote it because it highlights the nature of the disagreement between the parties. Appellee inquires:

Did the Circuit Court properly affirm the decision of the Maryland Tax Court upholding the Comptroller's right to subject to an apportioned State income tax a capital gain earned by Hercules on the sale of its interest in HIMONT, Inc., a corporation that Hercules created; that provided Hercules with a guaranteed source of an essential product; and that served as the vehicle by which Hercules was able to transform the nature of its business operations?

In addition, appellee raises a question on its cross-appeal, phrased as follows:

Did the Circuit Court err in denying the Comptroller's Motion to Dismiss a Petition for Judicial Review that was not filed within 30 days of the administrative order from which review was sought?

**Discussion**

**A.**

*Motion to Dismiss*

Appellee points out that a petition for judicial review must be filed within 30 days after the order that is the subject of the petition. Relying on *Hess v. Chalmers,* 27 Md.App. 284, 339 A.2d 706, *cert. denied,* 276 Md. 744 (1975), and *Furman v. Glading,* 36 Md.App. 574, 374 A.2d 414 (1977), *aff'd,* 282 Md. 200, 383 A.2d 398 (1978), appellee argues that when an order is withdrawn and reinstated, the time for appeal, at best, is merely stayed during the period of withdrawal. Appellee asserts that the order being attacked in this case is the January 3 order and, excluding the time period during which the order was withdrawn, the appeal should have been filed by March 23 at the latest. Thus, it claims that the March 24 notice of appeal is untimely. We disagree.

*Hess* merely stands for the proposition that when an order is stayed, the time for appealing likewise is stayed. *Hess* does not govern the situation when an order has been withdrawn. Similarly, *Furman* did not involve the precise issue presented in this case. In *Furman*, the trial court entered an order on October 8, 1976, granted appellant's motion for reconsideration on October 22, 1976, and vacated its grant of reconsideration on November 8, 1976. Appellant thereafter noted an appeal on November 10, 1976. The appellee had argued that the appeal was untimely with respect to the initial order because it was not filed within thirty days of the initial order. Citing *Hess*, we disagreed and held that the time for appeal did not run between October 22, 1976 and November 8, 1976, the period of time during which the October 8 order effectively had been stricken. Despite the terminology we employed in that case, we were not required to decide, and did not decide, whether the time for noting an appeal is merely interrupted by an order that strikes out an initial order or whether the time for appeal commences anew once the order has been restored.

We now hold that the time for appeal from an order that was withdrawn by the trial court begins to run from the time the order subsequently is reinstated. Unlike the situation when an order is stayed, an order that is withdrawn has no effect after its withdrawal. Moreover, in this case the March 16 order, on its face, does not purport to relate back to the January 3 order. The Court of Appeals, while it has not squarely decided the issue, seems to read the rules as we do. *See Carroll County Dept. of Social Services v. Edelmann,* 320 Md. 150, 164, 577 A.2d 14 (1990). Accordingly, appellant's appeal was timely filed.

### B.

### *Refund Claim*

Both the Due Process Clause and the Commerce Clause of the United States Constitution prohibit a state from taxing value earned outside its borders. *Allied–Signal, Inc. v. Di-*

*rector, Div. of Taxation,* 504 U.S. 768, 777, 112 S.Ct. 2251, 2257–58, 119 L.Ed.2d 533 (1992). A state's power to tax an individual's or corporation's activities "is justified by the 'protection, opportunities and benefits' the State confers on those activities." *Allied–Signal,* 504 U.S. at 778, 112 S.Ct. at 2258. If the income or gain the state seeks to tax arises out of interstate activities, a state may tax such income or gain when there is "a 'minimum connection' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 165–66, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, *reh'g denied,* 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983) (quoting *Exxon Corp. v. Wisconsin Dept. of Revenue,* 447 U.S. 207, 219–20, 100 S.Ct. 2109, 2118–19, 65 L.Ed.2d 66 (1980), in turn quoting *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 436–37, 100 S.Ct. 1223, 1231–32, 63 L.Ed.2d 510 (1980)).

As the Supreme Court has noted, when a business operates both within and without the borders of a state, "arriving at precise territorial allocations of 'value' is often an elusive goal, both in theory and in practice." *Container Corp.,* 463 U.S. at 164, 103 S.Ct. at 2939. The Constitution imposes "no single [allocation] formula on the States." *Id.* Further, "the taxpayer has the distinct burden of showing by 'clear and cogent evidence' that [the state tax] results in extraterritorial values being taxed. . . .'" *Id.* (quoting *Exxon Corp.,* 447 U.S. at 221, 100 S.Ct. at 2119, quoting *Norfolk & Western R. Co. v. North Carolina ex rel. Maxwell,* 297 U.S. 682, 688, 56 S.Ct. 625, 628, 80 L.Ed. 977 (1936)). *See also Allied–Signal,* 504 U.S. at 782, 112 S.Ct. at 2260 (same); *Mobil Oil Corp.,* 445 U.S. at 439, 100 S.Ct. at 1232–33 (holding that "what appellant must show, in order to establish that its dividend income is not subject to an apportioned tax in Vermont, is that the income was earned in the course of activities unrelated to the sale of petroleum products in that State.").

The two generally accepted methods of allocating intrastate versus out of state income are the separate geographical

accounting method and the unitary business/formula apportionment method. *Container Corp.*, 463 U.S. at 164–65, 103 S.Ct. at 2939–40; *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 316–17, 102 S.Ct. at 3108–10 (1982); *Mobil Oil Corp.*, 445 U.S. at 438, 100 S.Ct. at 1232. *See also* Keesling & Warren, *The Unitary Concept in the Allocation of Income,* 12 Hastings L.J. 42, 43 (1980). Maryland has adopted both of these methods as codified at § 10–402 of the Tax–General Article.[1] In particular, § 10–402(b) permits separate accounting based on the geographic locations of the businesses if practicable. By contrast, § 10–402(c) provides that where the trade or business is a unitary business, the part of the income derived from or reasonably attributable to the State shall be determined by application of a three-factor apportionment fraction.

Maryland has approved two tests for determining whether a corporation is engaged in a unitary business—the unities and dependency tests. *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 837, 490 A.2d 1296 (1985) (citing *Xerox Corp. v. Comptroller*, 290 Md. 126, 139, 428 A.2d 1208 (1981)). The unities test, devised by the Supreme Court of California, "focuse[s] on the presence of the following circumstances: '(1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation.'" *Xerox Corp.*, 290 Md. at 139, 428 A.2d 1208 (quoting *Butler Bros. v. McColgan*, 17 Cal.2d 664, 111 P.2d 334, 341 (1942), *aff'd*, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942)). In applying this test, a court must consider whether there is "(1) functional integration; (2) centralization of management; and (3) economies of scale." *Allied–Signal*, 504 U.S. at 781, 112 S.Ct. at 2260 (citing *F.W. Woolworth Co. v. Taxation and Revenue Dept. of N.M.*, 458 U.S. 354, 364, 102 S.Ct. 3128, 3135, 73 L.Ed.2d 819, *reh'g denied*, 459 U.S. 961, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982)); *Mobil Oil Corp.*, 445 U.S. at 438, 100

---

1. All references shall be to the 1988 Code, 1996 Supp.

S.Ct. at 1232 (citing *Butler Bros.,* 315 U.S. at 508–09, 62 S.Ct. at 704–05).

■ The dependency test has been described as follows: "[W]hether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or contributory to others." *Xerox Corp.,* 290 Md. at 139, 428 A.2d 1208 (quoting *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 138 N.W.2d 612, 616 (1965), *appeal dismissed,* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966)). *See also Wisconsin Dept. of Revenue v. Exxon Corp.,* 90 Wis.2d 700, 281 N.W.2d 94, 100 (1979), *aff'd,* 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (quoting Altman & Keesling, *Allocation of Income in State Taxation,* at 101 (2d ed.)). Further, although it neither approved nor disapproved the test at the time, the Supreme Court acknowledged the test's existence in *Exxon Corp.,* 447 U.S. at 217–18, 100 S.Ct. at 2117–18. More recently, the United States Supreme Court has stated that

the payee and the payor need not be engaged in the same unitary business as a prerequisite to apportionment in all cases. *Container Corp.* says as much. What is required instead is that the capital transaction serve an operational rather than an investment function.

*Allied–Signal,* 504 U.S. at 787, 112 S.Ct. at 2263 (citing *Container Corp.,* 463 U.S. at 180 n. 19, 103 S.Ct. at 2948 n. 19, citing *Exxon Corp.* generally). We see no practical difference between the "operational function" test set forth in *Allied–Signal* and the dependency test recognized by Maryland. Thus, if the requisites of the unities test have not been met, a state still may tax income derived from interstate activities if the activities serve an operational function rather than merely an investment function of the business being taxed.

Appellant argues that the Tax Court erred in determining that Maryland may tax the gain realized by appellant upon the sale of its interest in HIMONT. Appellant asserts that it is

unclear whether the Tax Court applied the unitary business test or the operational function test, but maintains that, in any event, appellant and HIMONT were not engaged in a unitary business, and appellant's investment in HIMONT did not serve an operational function.

Before addressing appellant's contentions, we note that although the parties both label the tests the "unitary business test" and the "operational function test," we will refer to the two tests as the unities test and the operational function test because we view both tests as slightly different versions of the unitary business test. The Supreme Court has stated that "the linchpin of apportionability in the field of state income taxation is the unitary-business principle." *Mobil Oil*, 445 U.S. at 439, 100 S.Ct. at 1232. We do not read *Allied–Signal* to have pronounced a brand new test. Indeed, examination of *Container Corp.*, the authority upon which it relies for its discussion of operational function, reveals that the Court in *Container Corp.* viewed the operational role of the investment as simply another means of determining whether a unitary business exists. 463 U.S. at 180 n. 19, 103 S.Ct. at 2948 n. 19. The tests have slightly different focuses—one being the inseparability of the intrastate and out of state activities, and the other being the respective functions of the intrastate and out of state activities. Whether we view the tests as distinct or merely different versions of the same query, or whether we label the tests "unities" versus "unitary business" or "dependency" versus "operational function," we simply must apply the various factors delineated by the Supreme Court to the economic realities of the case before us in order to determine the constitutionality of the tax.

■ Before we consider the merits of appellant's contentions, we will set forth the appropriate standard of review. The Maryland Tax Court is an administrative agency of the executive branch of the State, and its decisions are subject to judicial review pursuant to § 13–532 of the Tax–General Article, and §§ 10–222 and 10–223 of the State Government Article. *See State Department v. Consumer Programs, Inc.*, 331

Md. 68, 71–72, 626 A.2d 360 (1993). The standard of review of Tax Court decisions is the same as that applicable to administrative review generally. *Supervisor v. Asbury Methodist Home*, 313 Md. 614, 626, 547 A.2d 190 (1988). That is, we will uphold the Tax Court's factual conclusions if they are supported by substantial evidence in light of the record as a whole, *Consumer Programs*, 331 Md. at 72, 626 A.2d 360 (citing *CBS, Inc. v. Comptroller of Treasury*, 319 Md. 687, 575 A.2d 324 (1990)), but will reverse a decision that is premised upon an erroneous conclusion of law. *Id.; Ramsay, Scarlett*, 302 Md. at 834, 837–38, 490 A.2d 1296.

■ The United States Supreme Court has recognized that the unitary business test is an exceedingly fact sensitive test. *Allied–Signal*, 504 U.S. at 785, 112 S.Ct. at 2262; *Container Corp.*, 463 U.S. at 176, 103 S.Ct. at 2945–46. Further, in *Ramsay, Scarlett*, the Court of Appeals characterized the ultimate conclusion of whether a business can be regarded as unitary as a factual conclusion that is to be accorded deference by the reviewing court. *Id.* at 835–36, 837–38, 490 A.2d 1296. The proper standard of review is "whether a reasoning mind reasonably could have reached the factual conclusion which the Tax Court reached...." *Id.* (citing *Comptroller v. Diebold, Inc.*, 279 Md. 401, 407, 369 A.2d 77 (1977) citing *Fairchild Hiller v. Supervisor*, 267 Md. 519, 298 A.2d 148 (1973)). The application of this standard " 'must not [result in] either judicial fact finding or a substitution of judicial judgment for agency judgment.' " *Id.* (quoting *Diebold, Inc.*, 279 Md. at 407, 369 A.2d 77).

■ In this case, as in the *Ramsay, Scarlett* case, there is no indication that the Tax Court applied the wrong legal principles. Instead, the challenges are to the Tax Court's application of the law to the particular facts of this case. Accordingly, we will uphold the decision of the Tax Court if, "in light of substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion of the Tax Court, consistent with a proper application of the unities and dependency tests." *Id.* at 838, 490 A.2d 1296.

Bearing in mind the deference to be accorded the Tax Court's determination, and the fact that it is appellant's burden to demonstrate that there is no constitutionally sufficient nexus between the gain from its sale of HIMONT and the State of Maryland, we now examine appellant's various contentions.

■ Relying on *Allied–Signal*, 504 U.S. at 789, 112 S.Ct. at 2264, appellant argues that to find a unitary business relationship, one must find functional integration, centralization of management, and economies of scale, and that these factors can only be demonstrated by a showing of transactions not undertaken at arm's length, a management role by the parent grounded in its own operational expertise and strategy, and by showing that the corporations are engaged in the same line of business. In this case, appellant first argues that it conducted its relationship with HIMONT at arm's length at all times and that it was required to do so after HIMONT became publicly traded. With respect to polypropylene resins, the sales protocol provided that the sale of HIMONT products to appellant or to Montedison had to be at market price less a discount, reflecting the fact that the selling and other indirect expenses would be less for sales to a parent of the venture than that incurred in the open marketplace. Further, the service agreements whereby appellant provided administrative services to HIMONT contained a pricing structure, and they were at arm's length.

Second, according to appellant, there was no centralized management. Appellant transferred its entire polypropylene manufacturing operation and, thereafter, had no operational expertise to offer. Appellant did not control HIMONT functionally, and this was assured by the various agreements between the parties. Additionally, the businesses of appellant and HIMONT were not functionally interdependent. The mere right to name three directors to the board of HIMONT is insufficient to satisfy the requirements of *Allied–Signal* and *Container Corp.*

Third, appellant argues that there is no evidence of economies of scale or a flow of value between the entities. Appel-

lant notes that the two businesses were not engaged in the same lines of business, and, although HIMONT did supply a raw material to appellant necessary for some of its operations, such sales were at arm's length.

In addition to arguing the absence of evidence to show a unitary business relationship, appellant argues that the HIMONT stock was not an operational asset. In order to be considered operational, an asset must be used by the taxpayer to assist it in its regular business; it must be more than just an investment. Appellant states that there were no loans or loan guarantees between appellant and HIMONT and no flow of value between the two entities. The ownership of HIMONT stock was not needed to assure appellant a source of supply of resins or the availability of resins at a level cost; the resins were readily available on the open market. Additionally, there was no managerial assistance and occupational expertise provided by appellant. The ownership and sale of the asset—the HIMONT stock—did not fulfill an operating function of appellant's business.

We agree with appellant that it is not entirely clear whether the Tax Court, in finding that appellant had not met its burden, focused on the unities between appellant and HIMONT or on the operational function of appellant's interest in HIMONT, or some hybrid of the two. As we stated earlier, however, if in light of all of the evidence before the Tax Court, a reasoning mind reasonably could have reached the same conclusion as the Tax Court, we must uphold its decision.

██ Whether the focus is on the unities between the entities or the functional aspect of their relationship, the essence that the unitary business test seeks to capture is "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation." *Container Corp.*, 463 U.S. at 166, 103 S.Ct. at 2940. In this case, the record sufficiently establishes such a flow of value. Both the stipulated facts and the testimony of appel-

lant's vice-president and general counsel, Mr. Maynard Turk, reveal that the holding of HIMONT stock was more than a merely passive investment. At the risk of being repetitive we will set forth below some of the more salient facts.

In 1983, appellant concluded that it no longer wished to engage in the business of manufacturing polypropylene resins, but instead, wished to expand its specialty chemical business which was more insulated from the market pressures incident to polypropylene manufacturing. It is the specialty chemical business in which appellant is engaged in the State of Maryland. Appellant then began seeking a joint venturer for the purpose of disposing of its polypropylene business. Appellant's vice-president and general counsel, Mr. Maynard Turk, testified that it had always been appellant's plan to seek a joint venturer rather than merely a purchaser for the assets because a potential purchaser "wouldn't have the necessary technology, and they would want some—I think some comfort or some support from somebody who had a stronger background in the technology." In early 1983, appellant approached Montedison with the concept of forming a joint venture for the purpose of manufacturing polypropylene resins. Montedison, an Italian company and a manufacturer of polypropylene, had unsuccessfully attempted to become involved in the U.S. market on a number of occasions prior. The joint venture sought to marry appellant's marketing ability with Montedison's more superior manufacturing technology and, thus, create the world's lowest cost producer of polypropylene on a world scale. Appellant contributed all of its manufacturing assets and technological personnel to the joint venture. Appellant and Montedison leased office space to HIMONT until such time as HIMONT was able to obtain or build its own office facilities. In addition, HIMONT contracted for certain administrative services (accounting, contracting, payroll and insurance services) from appellant and Montedison pursuant to a series of written agreements. While the services provided by appellant diminished as time went on, they did not fully end until a year after appellant disposed of its stock in HIMONT. Mr. Turk described HI-

MONT as an immediate success. In February 1987, HI-
MONT was subject to a public stock offering wherein HI-
MONT raised in excess of $379,000,000.00, and in September
1987, appellant sold its interest in HIMONT to Montedison for
net proceeds of $1,487,500,000.00.

Appellant argues that the details regarding the formation of
HIMONT are not relevant to determining whether the gain
from the sale of its stock can be taxed by Maryland. Appel-
lant argues that, instead, we should examine only the actual
sale of the stock to determine whether the sale served an
operational function of HIMONT. Appellant argues that if we
restrict our inquiry in this manner, we will see that the sale
was not occasioned by an operational goal of appellant. Spe-
cifically, during his testimony, Mr. Turk stressed that the
ultimate sale to Montedison was occasioned by threats from
Montedison of a hostile tender offer.

First, we note that we are not required to restrict our
examination to the precise snapshot urged by appellant. *See
Mobil Oil Corp.*, 445 U.S. at 440, 100 S.Ct. at 1233 (rejecting
taxpayer's suggestion that the Court should treat taxpayer's
receipt of dividends as a discrete "taxable event" bearing no
relationship to its operations in Vermont). Regardless of the
trigger for the precise timing of the sale, the record as a whole
supports the view that the sale did, indeed, further an opera-
tional goal of appellant. In its 1987 annual report, appellant
stated that "[f]rom the early 80's, Hercules' primary objective
for polypropylene resins was the enhancement of its value for
ultimate disposition" and that "[t]he sale of HIMONT repre-
sents Hercules' substantial and highly profitable disengage-
ment from the polypropylene resins business." Further, ap-
pellant stipulated that in 1983 "it developed a course of action
designed to reduce its exposure to petrochemical commodities
by strategically changing from a commodity based chemical
company to a specialty based chemical company," and that
"Hercules' efforts over the years, from 1983 to 1987, in
disposing of *this major element of Hercules* [referring to its
interest in HIMONT] benefitted Hercules in terms of en-

hanced expansion into value added, growth oriented areas of the chemical industry." (Emphasis added.)

 Appellant asserts that the Tax Court's treatment of the sale of stock "comes dangerously close to being an argument that the sale of the HIMONT stock in 1987 was part of a step transaction initiated with the creation of HIMONT in 1983." Citing *Greene v. U.S.*, 13 F.3d 577 (2nd Cir.1994), appellant argues that the step transaction doctrine has no application to the facts of this case because (1) there was no binding commitment to undertake the sale at the time of formation, (2) the final sale was not prearranged at the time of the formation, and (3) the steps leading up to the sale are not so interdependent as to have no independent significance when viewed separately. Contrary to appellant's argument, the stipulations and the statements made by appellant in its annual report do suggest that the final sale (although not the precise timing of the sale) was contemplated by appellant at the time of formation. In any event, the step transaction doctrine is a doctrine whereby two or more separate transactions are treated as a single taxable event rather than as separate taxable events. *See generally Penrod v. Commissioner*, 88 T.C. 1415, 1428–37, 1987 WL 49335 (1987). That is not what the Tax Court has done in this case. Instead, it merely looked at the entire history of the formation of HIMONT up to and including the sale of stock to determine the operational significance of the sale of the stock. This clearly was appropriate under the unitary business test. *See Allied–Signal*, 504 U.S. at 775, 788, 112 S.Ct. at 2263, 2264 (in determining whether state could tax dividends received by a parent from its subsidiary, the Court examined the entire relationship between the parent and subsidiary); *F.W. Woolworth Co.*, 458 U.S. at 362–70, 102 S.Ct. at 3134–38 (same); *ASARCO*, 458 U.S. at 320–24, 102 S.Ct. at 3111–13 (same).

 In addition to providing appellant with a vehicle for disposing of its polypropylene business, the creation of HIMONT provided appellant with a supplier of polypropylene resins which it continued to use in its business after the

formation of HIMONT. For the years 1984 through 1987, HIMONT's sales to appellant were 12 to 13% of its total sales. In 1988, the year after appellant disposed of its HIMONT stock, HIMONT's sales to appellant represented only 7.8% of its total sales. While, as appellant points out, the mere fact of such sales does not satisfy the unitary business test, *see ASARCO*, 458 U.S. at 320–22, 102 S.Ct. at 3111–12, this case is distinguishable from *ASARCO*, in which the sales between the parent and subsidiary constituted the sole criterion in support of a unitary business finding. Certainly, the supply of raw materials from an affiliate or subsidiary to the owner company is a relevant factor for consideration. *See Container Corp.*, 463 U.S. at 180 n. 19, 103 S.Ct. at 2948 n. 19 (discussing *Corn Products v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), *reh'g denied*, 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 823 (1956)).

Appellant argues that this case is indistinguishable from *Allied–Signal*. Appellant notes that like the investment at issue in *Allied–Signal*, appellant and HIMONT had no common managers, officers or employees, no joint borrowings, no loans in either direction, no debt guarantees, and only some sales conducted at arms length. *Allied–Signal*, however, is significantly distinguishable from this case. Unlike the taxpayer in *AlliedSignal*, appellant created HIMONT through the vehicle of a joint venture, contributed 50% of HIMONT's operating assets to HIMONT, and contributed all of its technical personnel to HIMONT. Further, there is evidence that appellant created HIMONT in order to divest itself of its polypropylene business, a factor that was not present in *Allied–Signal*. Appellant and HIMONT did substantial business with one another, whereas the parties in *Allied–Signal* stipulated that the sales by ASARCO's subsidiaries to Bendix "were minute compared to Asarco's total sales." 504 U.S. at 775, 112 S.Ct. at 2256. Further, appellant and Montedison had veto power over major corporate acts of HIMONT pursuant to HIMONT's by-laws.

Contrary to appellant's assertion, this is not a case in which the Tax Court grounded the constitutionality of Maryland's

tax on "the mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions . . . ." *Allied–Signal*, 504 U.S. at 788, 112 S.Ct. at 2263. This language refers to the fact that New Jersey's basic theory in *Allied–Signal* was that "multistate corporations like Bendix regard all of their holdings as pools of assets, used for maximum long-term profitability, and that any distinction between operational and investment assets is artificial." *Id.* at 784, 112 S.Ct. at 2262. The Supreme Court noted that, while it could be assumed that the managers of Bendix cared most about the profits entry on a financial statement, such state of mind "sheds little light on the question whether in pursuing maximum profits they treated particular intangible assets as serving, on the one hand, an investment function, or, on the other hand, an operational function." *Id.* at 785, 112 S.Ct. at 2262. Given that all investments ideally serve the purpose of increasing a company's profitability, New Jersey's characterization sought to obliterate the line between investment and operational function, a line that the Supreme Court determined was worthy of retaining. By contrast, the function of the creation of HIMONT and ultimate sale of HIMONT stock was not merely to increase the investor's profitability in the usual sense of the term, but instead, was to transform the nature of the investor's business. Rather than disregard the line between investment and operational function, the Tax Court determined on which side of the line appellant's investment in HIMONT fell.

Our review of the entire record before the Tax Court convinces us that a reasoning mind reasonably could have concluded, as did the Tax Court, that appellant failed to meet its burden of demonstrating that the gain from its sale of HIMONT stock was not taxable by the State of Maryland.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.